# IN THE SUPREME COURT OF IOWA

No. 08–1100

Filed March 4, 2011

**C & J VANTAGE LEASING CO.,**
Assignor to Frontier Leasing Corp., Assignee,

    Appellee,

vs.

**THOMAS WOLFE** d/b/a **LAKE MACBRIDE GOLF COURSE** and **THOMAS WOLFE,** Individually,

    Appellants.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Don C. Nickerson, Judge.

Defendants seek further review from the court of appeals decision affirming the district court's grant of summary judgment enforcing an agreement. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Billy J. Mallory and Allison M. Steuterman of Brick, Gentry, Bowers, Swartz & Levis, P.C., West Des Moines, for appellants.

Edward N. McConnell and Aaron Ginkens of Ginkens & McConnell, P.L.C., Clive, for appellee Frontier Leasing Corporation.

**WIGGINS, Justice.**

Thomas Wolfe d/b/a Lake MacBride Golf Course and Thomas Wolfe, individually (hereinafter collectively referred to as Lake MacBride), seek a ruling reversing the district court's entry of summary judgment in favor of C & J Vantage Leasing Company, assignor to Frontier Leasing Corporation, assignee, and dismissal of Lake MacBride's counterclaims and third-party claims. The court of appeals affirmed the district court's rulings. On further review, we find there are genuine issues of material fact with regard to some of Lake MacBride's affirmative defenses, counterclaims, and third-party claims. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

In 2003, a sales representative of Royal Links USA, Inc., an advertising company, called Lake MacBride Golf Course and informed Lake MacBride that it could receive a nonmotorized snack and beverage cart at no cost in exchange for displaying advertising on the cart. The sales representative also informed Lake MacBride that Royal Links would make all the necessary arrangements, and Lake MacBride simply had to execute a program agreement, a lease agreement, and several other documents.

Accordingly, in July, Tracy Hufford, Lake MacBride's general manager, executed a credit application on behalf of Lake MacBride for one beverage cart and sent the application to Royal Links. Royal Links then transmitted the credit application to C & J, who approved the application. Thereafter, the sales representative informed Lake MacBride the credit application had been approved. Later in July, Royal Links sent

Lake MacBride a program agreement, a lease agreement, and a personal guaranty for the beverage cart, which Thomas Wolfe, Lake MacBride's owner, and Hufford executed.

The program agreement provided Lake MacBride would permit Royal Links to display advertising on the beverage cart in exchange for sixty monthly payments from Royal Links in the amount of $299 each month. Upon the expiration of this initial term, Royal Links agreed to continue to pay Lake MacBride $2000 a year for the next five years for the right to continue displaying advertising on the beverage cart. The program agreement also provided, "Upon expiration or termination of this Agreement, Royal Links USA will have the option to purchase any or all of the Beverage Caddy Express units from [Lake MacBride] for $1.00 each."

The lease agreement identified C & J as the lessor, Lake MacBride as the lessee, and Royal Links as the equipment supplier of the beverage cart. The lease agreement stated, "**The Equipment Supplier Is Not An Agent Of The Lessor**." Mirroring the program agreement, the lease agreement purported to lease the beverage cart to Lake MacBride in exchange for sixty monthly payments to C & J in the amount of $299 each month. Thus, from Lake MacBride's perspective, the result of this transaction appeared to be that Lake MacBride would receive a beverage cart at no cost because the monthly amount it was obligated to pay C & J to lease the beverage cart was equal to the monthly amount it would receive from Royal Links in exchange for allowing advertising to be displayed on the beverage cart.

The lease agreement stated in bold capital letters, "**THIS LEASE IS NONCANCELABLE.**" The lease agreement also provided, "Lessee may purchase equipment at the end of the lease for $1.00 provided the terms

of the lease are met." Finally, the lease agreement disclaimed any causes of action based on express or implied warranties against C & J. Wolfe also executed a personal guaranty in favor of C & J in relation to Lake MacBride's obligations under the lease agreement.

Thereafter, C & J purchased one beverage cart from Royal Links for $12,500 and shipped it to Lake MacBride. Upon receipt of the beverage cart, Hufford signed a "Delivery and Acceptance Certificate" addressed to C & J. By signing this document, Hufford acknowledged Lake MacBride satisfactorily received the beverage cart and Royal Links was not an employee or agent of C & J.

In October 2004, Royal Links notified Lake MacBride that it would no longer pay Lake MacBride the monthly advertising sums of $299 pursuant to the program agreement. C & J still expected Lake MacBride to continue to make the monthly lease payments of $299 pursuant to the lease agreement. Nevertheless, Lake MacBride stopped making payments to C & J.

In May 2005, C & J brought a breach of contract action against Lake MacBride to recover the defaulted payments under the lease agreement. In response, Lake MacBride asserted the affirmative defenses of estoppel, unconscionability, mutual mistake, fraud in the inducement, frustration of purpose, and negligent supervision, among others. Lake MacBride also filed a counterclaim/third-party petition against C & J, the President/CEO of C & J (hereinafter collectively referred to as C & J), and Royal Links.[1] The counterclaim/third-party petition raised claims of

---

[1]On August 19, 2005, Royal Links filed a voluntary petition for Chapter 7 bankruptcy. The bankruptcy court automatically stayed Lake MacBride's third-party petition against Royal Links and Lake MacBride's counterclaims/third-party-petition claims moved forward as to the non-bankruptcy parties.

fraudulent misrepresentation, equitable and constructive fraud, violation of the business opportunity statute, and concert of action. It also attempted to pierce the corporate veil. Lake MacBride further alleged the lease agreement was a disguised secured transaction that violated Iowa law. In responding to the counterclaim/third-party petition, C & J disavowed any agency relationship with Royal Links and claimed Lake MacBride was barred from raising any counterclaims/third-party claims against C & J due to the presence of the hell-or-high-water clause in the lease agreement.

On November 1, 2006, C & J assigned the lease agreement and personal guaranty to Frontier. C & J then amended its petition to substitute Frontier in the place of C & J as the real party in interest. Subsequently, Frontier and Lake MacBride filed competing motions for summary judgment.

The court determined the lease agreement constituted a finance lease that contained an enforceable hell-or-high-water clause prohibiting Lake MacBride from asserting any counterclaims against Frontier. The court also held no agency relationship existed between C & J and Royal Links. In addition, the court rejected Lake MacBride's affirmative defenses and counterclaims/third-party claims of unconscionability, mutual mistake, violation of the business opportunity statute, and failure to mitigate damages. Further, the court rejected the claim raised in Lake MacBride's resistance that the lease agreement was void because it failed to disclose an interest rate. Finally, the court held the lease agreement's integration clause and the parol-evidence rule barred extrinsic evidence of the lease agreement. Thus, the district court granted Frontier's motion for summary judgment, denied Lake

MacBride's motion for partial summary judgment, and entered judgment in favor of Frontier for $14,431.50.

Following the entry of judgment, both Frontier and Lake MacBride filed motions to enlarge, amend, or modify the district court's ruling and judgment. The parties sought clarification as to whether or not the court had dismissed Lake MacBride's counterclaims and third-party-petition claims. Accordingly, the district court modified its judgment and dismissed Lake MacBride's counterclaims and third-party claims with prejudice. In addition, the district court awarded Frontier $13,088.91 in attorney fees.

Lake MacBride filed a notice of appeal, and we transferred the case to the court of appeals. The court of appeals affirmed the district court's judgment. Thereafter, Lake MacBride filed an application for further review, which we granted.

## II. Issues.

In this appeal, we must consider six issues. First, we must decide whether the lease agreement constitutes a finance lease or a sale with a security interest. Second, we must determine the enforceability of the agreement's hell-or-high-water clause. Third, we must consider if there are genuine issues of material fact regarding whether Royal Links was acting as an agent for C & J. Fourth, we must decide whether there are genuine issues of material fact supporting Lake MacBride's affirmative defenses, counterclaims, and third-party claims. Fifth, we must resolve whether the lease agreement's integration clause and the parol-evidence rule prohibit the admission of extrinsic evidence of the agreement. Finally, we must consider the issue of attorney fees.

### III.  Scope of Review.

We review a district court decision granting or denying a motion for summary judgment for correction of errors at law.  *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 771 (Iowa 2009).  If the moving party has met his or her burden of showing the nonexistence of a material fact, summary judgment is appropriate.  *Bank of the W. v. Kline*, 782 N.W.2d 453, 456 (Iowa 2010).  We afford the nonmoving party every legitimate inference that can be reasonably deduced from the evidence.  *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 434 (Iowa 2008).  Where reasonable minds can differ on how an issue should be resolved, a fact question has been generated, and summary judgment should not be granted.  *Id.*  Accordingly, our review is limited to whether a genuine issue of material fact exists and whether the district court applied the correct law.  *Bank of the W.*, 782 N.W.2d at 457.

In addition, we review issues of statutory construction for correction of errors at law.  *Martinek v. Belmond-Klemme Cmty. Sch. Dist.*, 760 N.W.2d 454, 456 (Iowa 2009).  We review a challenge to a district court's award of attorney fees for an abuse of discretion.  *NevadaCare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 469 (Iowa 2010).  This means we will only reverse an attorney-fee award if the court's ruling rests on grounds that are clearly unreasonable or untenable.  *Id.*

### IV.  Finance Lease or Disguised Sale with a Security Interest.

First, we must decide whether the lease agreement entered into between the parties is properly considered a finance lease, as urged by Frontier, or a disguised sale with a security interest, as argued by Lake MacBride.

Iowa's version of the Uniform Commercial Code (UCC) is codified as Iowa Code chapter 554 (IUCC).  Article 1 of the IUCC contains general

provisions, including the definition of a security interest. Article 13 of the IUCC governs leases, including finance leases. Article 9 of the IUCC addresses secured transactions.

A lease is defined as a "transfer of the right to possession and use of goods for a term in return for consideration, but a sale . . . or retention or creation of a security interest is *not* a lease." Iowa Code § 554.13103(1)(*j*) (2003) (emphasis added). A finance lease is a lease that meets several additional statutory requirements. *See id.* § 554.13103(1)(*g*). We recently described a typical finance lease as follows:

> "A 'finance lease' involves three parties—the lessee/business, the finance lessor, and the equipment supplier. The lessee/business selects the equipment and negotiates particularized modifications with the equipment supplier. Instead of purchasing the equipment from the supplier, the lessee/business has a finance lessor purchase the selected equipment, and then leases the equipment from the finance lessor."

*C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC*, 784 N.W.2d 753, 756–57 (Iowa 2010) (quoting *Colonial Pac. Leasing Corp. v. McNatt*, 486 S.E.2d 804, 807 (Ga. 1997)).

A transaction must first qualify as a lease before it can qualify as a finance lease. U.C.C. § 2A-103, cmt. (g) (amended 2003), 1C U.L.A. 829 (2004); *see also* Iowa Code § 554.13103(1)(*g*) (stating, " '*Finance lease*' means a lease"); *Outlook Farm Golf Club, LLC*, 784 N.W.2d at 757. The definition of a lease specifically excludes a transaction that retains or creates a security interest. Iowa Code § 554.13103(1)(*j*). Thus, to determine whether the lease agreement is properly considered a finance lease or a secured transaction, we must first consider whether the agreement retained or created a security interest. *Outlook Farm Golf Club, LLC*, 784 N.W.2d at 757. If so, the agreement cannot qualify as a

lease or a finance lease because an agreement retaining or creating a security interest is specifically excluded from the definition of a lease. Iowa Code § 554.13103(1)(*j*).

The facts of each transaction determine whether the transaction is a lease or a sale with a security interest. *Id.* § 554.1201(37)(*b*). A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." *Id.* § 554.1201(37)(*a*). Iowa Code section 554.1201(37)(*b*) contains a bright-line test for determining whether an agreement creates a security interest. It provides that a transaction creates a security interest if

> the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
>
> (1) the original term of the lease is equal to or greater than the remaining economic life of the goods,
>
> (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or
>
> (4) *the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.*

*Id.* § 554.1201(37)(*b*) (emphasis added). The first part of the bright-line test is found in the unnumbered paragraph of section 554.1201(37)(*b*). The second part of the bright-line test contains the four criteria listed in sections 554.1201(37)(*b*)(1)–(4). Each of the four criteria listed in the second part of the bright-line test are objectively based on economics,

not the intent of the parties.  U.C.C. § 1-201, cmt. 37 (amended 1999), 1 U.L.A. 168 (2004); *PSINet, Inc. v. Cisco Sys. Capital Corp.* (*In re PSINet, Inc.*), 271 B.R. 1, 44 (Bankr. S.D.N.Y. 2001).

In other words, under the bright-line test, the lease agreement in this case creates a security interest, and cannot be characterized as a lease or a finance lease, if it:  (1) prohibits Lake MacBride from terminating the obligation to pay Frontier for the right to possess and use the beverage cart, and (2) meets one of the four independent criteria listed in section 544.1201(37)(*b*).  Iowa Code § 554.1201(37)(*b*)(1)–(4); *see also PSINet, Inc.*, 271 B.R. at 43–45 (recognizing the presence of any one of the four criteria indicates the lessor did not retain a residual interest in the property and therefore, the lease is not a true lease); *Outlook Farm Golf Club, LLC*, 784 N.W.2d at 757–58.

Applying the first part of the bright-line test, we find the lease agreement prohibited Lake MacBride from terminating its obligation to pay Frontier for the right to possess and use the beverage cart.  The agreement states in bold capital letters, "**THIS LEASE IS NONCANCELABLE**."  The parties treat this statement as a hell-or-high-water clause, which is defined as "[a] clause in a personal-property lease requiring the lessee to continue to make full rent payments to the lessor even if the thing leased is unsuitable, defective, or destroyed."  *Black's Law Dictionary* 742 (8th ed. 2004).  Additionally, if Lake MacBride defaulted by refusing to tender payment to Frontier, under section fourteen of the lease agreement it would simultaneously incur an immediate obligation for all of the agreement's remaining payments. *Hunter v. Snap-On Credit Corp.* (*In re Fox*), 229 B.R. 160, 165 (Bankr. N.D. Ohio 1998) (recognizing the first part of the bright-line test is met when the lessee cannot cancel the agreement without simultaneously

incurring an immediate obligation for the total cost of the equipment). Finally, section fifteen of the agreement states, "All obligations of Lessee hereunder shall continue until full performance has been rendered and shall not be released by termination of this Lease." Thus, we conclude the lease agreement meets the first part of the bright-line test.

Applying the second part of the bright-line test, we note the lease agreement provides, "Lessee may purchase equipment at the end of the lease for $1.00 provided the terms of the lease are met." If the only economically sensible decision is for the lessee to exercise the purchase option, the additional consideration is considered nominal. *PSINet, Inc.*, 271 B.R. at 45. The law is well established that a purchase-option price of $1 amounts to nominal additional consideration, leaving no need to further analyze the economic sensibility of purchasing the equipment for that price. *Id.*; *accord In re Macklin*, 236 B.R. 403, 407 (Bankr. E.D. Ark. 1999) (construing agreement as a secured transaction because lessee was provided the option to become owner of the equipment at the end of the lease term for the nominal sum of $1); *In re Eagle Enters., Inc.*, 223 B.R. 290, 299 (Bankr. E.D. Pa. 1998) (same), *aff'd* 237 B.R. 269 (E.D. Pa. 1999); *All Am. Mfg. Corp. v. Quality Textile Screen Prints, Inc.* (*In re All Am. Mfg. Corp.*), 172 B.R. 394, 398 (Bankr. S.D. Fla. 1994) (same); *C & J Leasing II Ltd. P'ship v. Swanson*, 439 N.W.2d 210, 211 (Iowa 1989) (same). Therefore, we find the lease agreement provides Lake MacBride with the option to become the owner of the beverage cart for nominal additional consideration upon compliance with the lease agreement. Thus, the second part of the bright-line test under Iowa Code section 554.1201(37)(*b*)(4) has been satisfied. Accordingly, we hold the lease agreement is a sale with a security interest and not a lease or a finance lease.

Frontier argues the parties intended the lease agreement to be a finance lease and drafted the agreement to reflect this intent. The agreement states,

> This agreement is, and is intended to be a Lease and Lessee does not acquire hereby any right, title or interest whatsoever, legal or equitable, in or to any of the equipment, or to the proceeds of the sale of any equipment, except its interest as Lessee hereunder.

In further support of this argument, Frontier cites the UCC's official comment to the definition of a finance lease, which provides, "[i]f a transaction does not qualify as a finance lease, the parties may achieve the same result by agreement; no negative implications are to be drawn if the transaction does not qualify."[2] U.C.C. Code § 2A-103, cmt. (g) (amended 2003), 1C U.L.A. at 830.

Frontier's argument, however, fails to consider the full context of the official UCC comment from which it cites. The comment begins with the recognition that before a transaction can qualify as a finance lease, it must first qualify as a lease. *Id.* at 829. The comment then describes a typical finance lease and explains the requirements necessary for a lease to qualify as a finance lease. *Id.* at 829–30. Finally, the comment states that if the transaction does not meet the statutory requirements necessary for a lease to qualify as a finance lease, the parties may nevertheless agree to treat it as having qualified as a finance lease. *Id.* at 830. Thus, while Lake MacBride and Frontier could have agreed to treat a lease as a finance lease, they could not agree to treat a sale with a

---

[2]Frontier also argues the agreement constitutes a finance lease with an attached security interest. However, in *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, LLC*, 784 N.W.2d 753, 756 n.3 (Iowa 2010), we recognized that due to the large body of law dedicated to differentiating between a lease and a security interest, an agreement cannot be both. Thus, we reject this argument.

security interest as a lease. Before a transaction can qualify as a finance lease, it must qualify as a lease.

Our interpretation of UCC § 2A-103 comment g is supported by other comments throughout the UCC. For example, the UCC comment describing the bright-line test for determining whether an agreement creates a security interest explains that all references to "the intent of the parties to create a lease or a security interest" were deleted from the bright-line test because such references led to "unfortunate results." U.C.C. § 1-201, cmt. 37 (amended 1999), 1 U.L.A. 168. Instead, the bright-line test focuses objectively on the economic reality of the transaction. *Id.* Moreover, the comment describing the definition of a security agreement explains:

> Whether an agreement creates a security interest depends not on whether the parties intend that the law *characterize* the transaction as a security interest but rather on whether the transaction falls within the definition of "security interest" in Section 1-201 [Iowa Code section 554.1201(37)(*b*)]. Thus, an agreement that the parties characterize as a "lease" of goods may be a "security agreement," notwithstanding the parties' stated intention that the law treat the transaction as a lease and not as a secured transaction.

U.C.C. § 9-102, cmt. 3(b), 3 U.L.A. 64–65 (2010). Accordingly, the fact the parties intended to treat the lease agreement as a lease or a finance lease is immaterial so long as the agreement substantively qualifies as a sale with a security interest under section 554.1201(37)(*b*).

## V. Enforceability of the Hell-or-High-Water Clause.

Next, we must decide what consequences stem from finding the lease agreement is a sale with a security interest. Lake MacBride claims the lease agreement's hell-or-high-water clause is unenforceable if we construe the agreement as a sale with a security interest, rather than a finance lease. Frontier claims the hell-or-high-water clause is

enforceable regardless of whether we deem the transaction a sale with a security interest or a finance lease.

A hell-or-high-water clause is a contractual provision that requires the lessee to absolutely and unconditionally fulfill its obligations under the lease in all events (i.e., come hell or high water).[3]  *Citicorp of N. Am., Inc. v. Lifestyle Commc'ns Corp.*, 836 F. Supp. 644, 656 (S.D. Iowa 1993); *Excel Auto & Truck Leasing, L.L.P. v. Alief Indep. Sch. Dist.*, 249 S.W.3d 46, 51 (Tex. App. 2007).  As explained by one court, a hell-or-high-water provision is

> a specialized clause peculiar to a three-party transaction, which insures that the payments owed by the lessee to a lessor who does not manufacture or supply the leased goods are independent of the state of the goods and irrevocable, so that the lessee looks to the manufacturer or supplier of goods for warranties and remedies for defects in the goods, not to the lessor.

*Excel Auto & Truck Leasing, L.L.P.*, 249 S.W.3d at 64 (Keyes, J., concurring in part and dissenting in part).  Courts have consistently enforced such clauses in the financial leasing context.  *See, e.g., Citicorp of N. Am., Inc.*, 836 F. Supp. at 656 (citing federal courts that have upheld the general validity of hell-or-high-water clauses); *W. Va. Dep't of Fin. & Admin. v. Hassett* (*In re O.P.M. Leasing Servs., Inc.*), 21 B.R. 993, 1006–07 (Bankr. S.D.N.Y. 1982) (citing numerous cases strictly enforcing hell-or-high-water provisions as a matter of law).  Our task is to determine the enforceability of such a provision in the context of a secured transaction.

---

[3]Both parties treat the clause in the lease agreement that states, "**THIS LEASE IS NONCANCELABLE**," as a properly formulated hell-or-high-water clause. Accordingly, for the purposes of this opinion, we will assume without deciding that this clause constitutes a hell-or-high-water clause.

The cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract. *NevadaCare, Inc.*, 783 N.W.2d at 466. We strive to give effect to all the language of a contract, which is the most important evidence of the contracting parties' intentions. *Id.*; *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 26 (Iowa 1978).

> Because an agreement is to be interpreted as a whole, it is assumed in the first instance that no part of it is superfluous; an interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.

*Fashion Fabrics of Iowa, Inc.*, 266 N.W.2d at 26. Contracting parties have wide latitude to fashion their own remedies for a breach of contract and to deny full effect to such express contractual provisions is ordinarily impermissible because it would "effectively reconstruct the contract contrary to the intent of the parties." *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. at 1006; *accord Nat'l Westminster Bancorp N.J. v. ICS Cybernetics, Inc.* (*In re ICS Cybernetics, Inc.*), 123 B.R. 467, 477 (Bankr. N.D.N.Y. 1989), *aff'd* 123 B.R. 480 (N.D.N.Y. 1990). Thus, courts generally enforce contractual limitations upon remedies unless such limitations are unconscionable. *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. at 1006.

If an agreement qualifies as a finance lease under the UCC, an express hell-or-high-water clause is unnecessary because such a provision automatically attaches to a finance lease by statute. *See* U.C.C. § 2A-407 (amended 2003), 1C U.L.A. 994 (2004); Iowa Code § 554.13407. With regard to security interests, no such statute exists in article 9 of the UCC or article 9 of the IUCC. *See* 1 Ian Shrank & Arnold G. Gough, *Equipment Leasing-Leveraged Leasing* § 3:1.10, at 3–26 (4th

ed. 2010) [hereinafter *Equipment Leasing-Leveraged Leasing*] (recognizing UCC article 9 does not create an automatic hell-or-high-water clause for a secured lender, although secured lenders play a similar role as finance lessors because both are suppliers of money). Instead, for a secured lender to receive the protection of a hell-or-high-water clause, the secured lender must expressly assert such a provision within the contract's language. *Id.* Accordingly, when a secured transaction contains an express hell-or-high-water clause, courts must grant the provision full effect. *See, e.g.*, *Key Equip. Fin. Inc. v. Pioneer Transp., Ltd.*, 472 F. Supp. 2d 1131, 1140–41 (W.D. Wis. 2007) (holding express hell-or-high-water clause was fully enforceable in a disguised sale creating a security interest); *Excel Auto & Truck Leasing, L.L.P.*, 249 S.W.3d at 63, 65 (Keyes, J., concurring in part and dissenting in part) (recognizing a hell-or-high-water clause can appear in any kind of agreement). Consequently, we hold an express hell-or-high-water clause contained within a disguised sale with a security interest is fully enforceable because to do otherwise would be to improperly reconstruct the contract contrary to the parties' intent.

Lake MacBride further argues Frontier cannot enforce the hell-or-high-water clause because it does not qualify as a holder in due course. Iowa Code section 554.9403(2) requires that an assignee must qualify as a holder in due course in order to enforce a waiver-of-defenses clause. *See Black's Law Dictionary* at 1612 (defining a waiver-of-defenses clause as "[t]he intentional relinquishment by a maker, drawer, or other obligor under a contract of the right to assert against the assignee any claims or defenses the obligor has against the assignor"). However, the lease agreement does not contain a waiver-of-defenses clause; instead, it only contains a hell-or-high-water clause.

One line of authority suggests that an assignee in a commercial (non-consumer) context need not qualify as a holder in due course to enforce a hell-or-high-water clause. *Equipment Leasing-Leveraged Leasing* § 3:2.2, at 3–33 to 3–34 (recognizing hell-or-high-water provisions are not subject to UCC § 9-403(b)); *accord Benedictine Coll., Inc. v. Century Office Prods., Inc.*, 853 F. Supp. 1315, 1325 (D. Kan. 1994) (recognizing assignee could enforce hell-or-high-water provision irrespective of holder in due course status); *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. at 1008 (same). Other courts, however, have treated hell-or-high-water clauses and waiver-of-defenses clauses as indistinguishable and required holder-in-due-course status before an assignee may enforce either clause. *See, e.g., Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 12–13 (1st Cir. 1986) (failing to distinguish between the two clauses).

We believe the position that an assignee may enforce a hell-or-high-water clause irrespective of its holder-in-due-course status is more persuasive and adopt it as the law in Iowa. These two clauses are distinguishable—a hell-or-high-water clause protects the lessor whereas a waiver-of-defenses clause protects an assignee of the lessor. *Compare Black's Law Dictionary* at 742 (defining hell-or-high-water clause), *with Black's Law Dictionary* at 1612 (defining waiver-of-defenses clause). Accordingly, we reject Lake MacBride's holder in due course argument.

Even though the hell-or-high-water clause is enforceable, Lake MacBride is not completely barred from raising its claims and defenses against Frontier. Lake MacBride may still raise claims and defenses that relate to contract formation, i.e., fraud in the inducement, fraudulent misrepresentation, equitable and constructive fraud, mutual mistake, estoppel, and unconscionability. *See, e.g., Outlook Farm Golf Club, LLC,*

784 N.W.2d at 758 (recognizing party may still raise defenses to contract formation despite presence of hell-or-high-water clause). In addition, Lake MacBride may still assert any statutory claims and defenses it has against Frontier, i.e., failure to disclose an interest rate in violation of Iowa Code chapter 535 and violation of chapter 551A, Iowa's business-opportunity-promotions statute.

### VI. Agency.

Lake MacBride next claims genuine issues of material fact exist as to whether Royal Links was acting as an agent of C & J, which would allow Lake MacBride to pursue its affirmative defenses of mutual mistake, fraud in the inducement, estoppel, and negligent supervision, as well as its counterclaims of fraudulent misrepresentation and equitable and constructive fraud against Frontier. These affirmative defenses and counterclaims center on Lake MacBride's allegation that the Royal Links sales representative misrepresented the nature of the transaction to Lake MacBride, thereby fraudulently inducing it to enter into the lease agreement. However, because the sales representative made all the alleged misrepresentations, in order to raise these affirmative defenses and counterclaims Lake MacBride must prove by a preponderance of the evidence that an agency relationship existed between the sales representative and C & J. *Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010); *see also Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 493 (Iowa 2000) (recognizing a principal is bound by whatever an agent does within the agent's scope of actual or apparent authority).

An agency relationship exists where an agent has actual (express or implied) authority or apparent authority to act on behalf of a principal. *Links Eng'g, LLC*, 781 N.W.2d at 776. On further review, Lake MacBride

only presents an apparent-authority argument. "Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing." *Id.* When determining if a principal vested an agent with apparent authority, the court must focus on the principal's actions and communications to the third party. *Id.* Thus, we must determine whether apparent authority exists based on C & J's conduct, rather than any conduct on the part of the Royal Links sales representative.

Frontier argues the lease agreement and the delivery and acceptance certificate explicitly stated that Royal Links was not an agent of C & J. Nevertheless, we have recognized that such express contractual statements are not conclusive as to whether an agency relationship exists. *Outlook Farm Golf Club, LLC,* 784 N.W.2d at 760.

The record reveals the beverage-cart program was "vendor-based," meaning C & J relied on vendors, such as Royal Links, to bring lessees, such as Lake MacBride, to C & J for financing. This may explain why Lake MacBride exclusively dealt with the Royal Links sales representative throughout the transaction, save for one delivery-verification telephone call from C & J. The credit application Lake MacBride executed contained Royal Links name at the top and restricted the release of the information contained in the application to "Royal Links USA and any of its affiliates and/or assigns." Royal Links then forwarded this credit application on to C & J for approval. Finally, Frontier has failed to explain how the monthly payments Lake MacBride was obligated to pay C & J to lease the beverage cart were miraculously identical to the monthly amounts Lake MacBride received from Royal Links in exchange for allowing advertising to be displayed on the beverage cart. These facts led Lake MacBride's general manager to state, "the sales representative

was authorized to act on behalf of and for the benefit of the leasing company."

Drawing all reasonable inferences in favor of Lake MacBride, the abovementioned facts constitute sufficient circumstantial evidence to generate a genuine issue of material fact that C & J knowingly permitted and/or held out Royal Links as possessing the authority to negotiate the terms of the lease agreement as well as prepare the paperwork used to execute the agreement. *See id.* at 759–60 (finding a genuine issue of material fact on the issue of agency under similar circumstances, where circumstantial evidence supported a finding that the principal may have allowed the alleged agent to negotiate the terms of the lease agreement and prepare the accompanying paperwork). Accordingly, while the finder of fact may ultimately conclude C & J did not permit or hold out Royal Links as its agent, we hold Lake MacBride has generated a genuine issue of material fact on this issue, allowing the question to go to the fact finder.

**VII. Other Affirmative Defenses, Counterclaims, and Third-Party Claims.**

**A. Fraud in the Inducement and Equitable Estoppel.** Lake MacBride claims the Royal Links sales representative fraudulently induced it into entering the lease agreement based on misrepresentations that the beverage cart was free and Frontier should be equitably estopped from claiming the sales representative was not acting as its agent. *See Paveglio v. Firestone Tire & Rubber Co.*, 167 N.W.2d 636, 638 (Iowa 1969) (stating the elements necessary to establish equitable estoppel). In response to these affirmative defenses, Frontier has only argued that the sales representative was not acting as C & J's agent and therefore, it is not bound by any of the alleged misrepresentations.

However, we have found a genuine issue of material fact exists as to whether C & J knowingly permitted and/or held out the sales representative as possessing the authority to negotiate the terms of the lease agreement and prepare the paperwork used to execute the agreement. Accordingly, Lake MacBride has established a genuine issue of material fact as to its affirmative defenses of fraud in the inducement and equitable estoppel.

**B. Unconscionability.** Lake MacBride argues it has established a genuine issue of material fact regarding its affirmative defense of unconscionability. Specifically, Lake MacBride claims the lease agreement is unconscionable because C & J used the misrepresentations of its agent to secure Lake MacBride's execution of the contract, concealed the agreement's interest rate, concealed the true value of the beverage cart, and used a credit application that claimed it would only disclose the credit information to Royal Links' affiliates and/or assigns.

A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand. *Smith v. Harrison*, 325 N.W.2d 92, 94 (Iowa 1982). In considering such claims, we consider the factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 181 (Iowa 1975). However, the doctrine of unconscionability does not exist to rescue parties from bad bargains. *Smith*, 325 N.W.2d at 94.

This doctrine encompasses both procedural abuses arising from the contract's formation and substantive abuses related to the contract's terms. *In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008); 17 C.J.S. *Contracts* § 4, at 417 (1999). Procedural unconscionability

involves an advantaged party's exploitation of a disadvantaged party's lack of understanding, unequal bargaining power between the parties, as well as the use of fine print and convoluted language. *Shanks*, 758 N.W.2d at 515, 517. Substantive unconscionability involves whether or not the substantive terms of the agreement are so harsh or oppressive that no person in his or her right senses would make it. *Id.* at 515–16. Finally, whether an agreement is unconscionable must be determined at the time it was entered. *Casey v. Lupkes*, 286 N.W.2d 204, 208 (Iowa 1979).

The record reveals Lake MacBride was an intelligent business entity that had the opportunity to read the entire lease agreement and calculate the amount it would owe C & J for the beverage cart. There is no evidence of unequal bargaining power between the parties or a lack of understanding on the part of Lake MacBride. There is also no evidence the substantive terms of the agreement were so oppressive that no person in his or her right senses would enter into it. Although the agreement ultimately amounted to a bad bargain for Lake MacBride, for over a year, Lake MacBride did receive the benefits of the beverage cart at no cost. Thus, we find there is no genuine issue of material fact that the lease agreement is procedurally or substantively unconscionable.[4] Consequently, the district court was correct when it found the lease agreement was not unconscionable.

---

[4]In *In re Marriage of Shanks*, 758 N.W.2d 506, 517–18 (Iowa 2008), we stated that "the use of fraudulent or deceptive practices to procure the disadvantaged party's assent to the agreement," is one of the factors we consider when determining whether an agreement is procedurally unconscionable. This factor amounts to a claim of fraud in the inducement. Because this is the only factor that may militate towards a finding of procedural unconscionability and we are remanding the case for a trial on this issue, this factor alone is not sufficient to generate a genuine issue of material fact as to whether the lease agreement is procedurally unconscionable.

**C. Mutual Mistake of the Parties.** Lake MacBride asserts there were two mutual mistakes in the formation of the parties' agreement—the belief Lake MacBride would receive the beverage cart at no cost and that the Royal Links sales representative was acting as an agent of C & J.

A mutual mistake in the formation of a contract occurs when the parties reach and correctly express the contract, yet enter into the contract based on a false underlying assumption. *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151 (Iowa 2001). The proper remedy for a mutual mistake in the formation of a contract is avoidance. *Nichols v. City of Evansdale*, 687 N.W.2d 562, 571 (Iowa 2004). For a mistake to be mutual, it must exist at the time the parties formed the contract and be common to both parties. *Krieger v. Iowa Dep't of Human Servs.*, 439 N.W.2d 200, 203 (Iowa 1989).

The record is devoid of evidence to support the inference that the other parties shared the mutual mistakes claimed by Lake MacBride at the time they entered into the lease agreement. Thus, the district court was correct when it found no genuine issue of material fact that the mistakes were mutual to all the parties at the time the parties entered into the lease agreement.

**D. Failure to Disclose an Interest Rate Under Iowa Code Chapter 535.** Lake MacBride complains the lease agreement contains a usurious interest rate that C & J did not disclose in violation of Iowa Code sections 535.2(1) and 535.17(1). The Iowa Code provides:

> The following persons may agree in writing to pay any rate of interest, and a person so agreeing in writing shall not plead or interpose the claim or defense of usury in any action or proceeding, and the person agreeing to receive the interest is not subject to any penalty or forfeiture for agreeing to receive or for receiving the interest:

. . . .

> (5)  A person borrowing money or obtaining credit for *business or agricultural purposes*, or a person borrowing money or obtaining credit in an amount which exceeds twenty-five thousand dollars for personal, family, or household purposes.

Iowa Code § 535.2(2)(*a*)(5) (emphasis added).  " '[*B*]*usiness purpose*' includes but is not limited to a commercial, service, or industrial enterprise carried on for profit and an investment activity." *Id.*

Lake MacBride agreed in writing to make sixty monthly payments of $299 to C & J in exchange for one beverage cart, which it used to sell refreshments to customers at its golf course.  The beverage carts were used in connection with the golf course operation and its use came within the goals of the business-purpose exception contained in section 535.2(2)(*a*)(5).  *Chapman's Golf Ctr. v. Chapman*, 524 N.W.2d 422, 426–27 (Iowa 1994).  Therefore, we find Lake MacBride could agree to pay any rate of interest and cannot now assert a usury defense because the lease agreement was for a "business purpose."

Lake MacBride also claims a genuine issue of material fact exists regarding its claim the lease agreement failed to disclose an interest rate in violation of Iowa Code section 535.17(1).  Section 535.17(1) states, "A credit agreement is not enforceable . . . unless a writing exists which contains all of the material terms of the agreement and is signed by the party against whom enforcement is sought."  Iowa Code § 535.17(1).  This section acts as a statute of frauds for credit agreements by ensuring that actions and defenses on credit agreements "are supported by clear and certain written proof of the terms of such agreements."  *Id.* § 535.17(6).

Assuming, without deciding, C & J qualifies as a "lender" and the lease agreement qualifies as a "credit agreement," Lake MacBride has

failed to show the agreement is unenforceable because it fails to contain "all of the material terms of the agreement," by not explicitly listing an interest rate. The agreement laid out the subject matter, price, payment terms, and duration. Although the agreement did not expressly list an interest rate, it did provide Lake MacBride was to make sixty monthly payments of $299 to C & J. Section 535.17(1) contains no requirement that the interest rate must be listed separate from the total payment required under the agreement. *Compare* Iowa Code § 535.17(1), *with* 15 U.S.C. § 1632 (2006) (requiring, among other things, disclosure of interest rates in the agreement). Accordingly, we find the express terms contained within the lease agreement were sufficient to satisfy the requirements of section 535.17(1).

**E. Violation of Iowa's Business-Opportunity-Promotions Statute.** Lake MacBride claims the transaction qualifies as a "business opportunity," and consequently violates Iowa's business-opportunity-promotions statute by failing to make the mandatory disclosures required by Iowa Code section 523B.2, thereby entitling it to rescission and damages.[5] It is undisputed that C & J failed to make the disclosures mandated by the statute. Accordingly, the only issue is whether the transaction qualifies as a "business opportunity" to which the statute applies.

Iowa Code section 523B.2(8)(*a*) provides it is unlawful for a "seller" to sell a "business opportunity" unless certain disclosures are made to

---

[5]Both Lake MacBride and Frontier cite Iowa Code chapter 551A with regard to the business-opportunity-promotions statute. Prior to 2004, this statute was contained in Iowa Code chapter 523B. *See* Iowa Code §§ 523B.1–.13 (2003). In 2004 the legislature amended chapter 523B and directed the code editor to transfer the statute to chapter 551A. *See* 2004 Iowa Acts ch. 1104, §§ 5–31. Accordingly, because the cause of action at issue in this case arose in 2003, prior to these changes, we will consider Lake MacBride's business-opportunity-promotions counterclaim by referencing the statute as it existed in 2003. *See* Iowa Code §§ 523B.1–.13 (2003).

the "purchaser" at least ten days before the agreement is executed. Under the statute, a "business opportunity" is defined as:

> [A] contract or agreement, between a seller and purchaser, express or implied, orally or in writing, at an initial investment exceeding five hundred dollars, where the parties agree that the seller or a person recommended by the seller is to provide to the purchaser any products, equipment, supplies, materials, or services *for the purpose of enabling the purchaser to start a business*, and the seller represents, directly or indirectly, orally or in writing, any of the following:
>
> . . . .
>
> (4) The purchaser will derive income from the business which exceeds the price paid to the seller.

Iowa Code § 523B.1(3)(*a*)(4) (emphasis added). The statute also makes several exclusions from the definition of "business opportunity." *See id.* § 523B.1(3)(*b*). One such exclusion states:

> "*Business opportunity*" does not include . . . [a]n offer or sale of a business opportunity to an *ongoing business* where the seller will provide products, equipment, supplies, or services which are substantially similar to the products, equipment, supplies, or services sold by the purchaser in connection with the purchaser's ongoing business.

*Id.* § 523B.1(3)(*b*)(2) (emphasis added). Finally, the statute further defines "ongoing business," as

> an existing business that for at least six months prior to the offer, has been operated from a specific location, has been open for business to the general public, and has substantially all of the equipment and supplies necessary for operating the business.

*Id.* § 523B.1(8).

The lease agreement allowed Lake MacBride to purchase the beverage cart from C & J for $1 at the end of the lease term. However, the program agreement between Royal Links and Lake MacBride stated upon expiration of the agreement, Royal Links had the option to purchase the beverage cart from Lake MacBride for $1. Accordingly,

Lake MacBride argues the transaction qualifies as a "business opportunity" under Iowa Code chapter 523B because it merely provided Lake MacBride with the ability to generate a revenue stream from "on course concession sales and advertising revenue" through use of the beverage cart. We disagree.

The transaction fails to meet the requirements of the definition of "business opportunity" because C & J did not provide the beverage cart to Lake MacBride to enable Lake MacBride to start a business. *See id.* § 523B.1(3)(*a*) (recognizing, for an agreement to qualify as a business opportunity, the seller must provide the product to the purchaser "for the purpose of enabling the purchaser to start a business"). At the time of the transaction, Lake MacBride qualified as an "ongoing business" under the statute. *See id.* § 523B.1(8). For twenty-six years, Lake MacBride had successfully operated its golf course in Solon, Iowa, and presumably possessed all the equipment and supplies necessary for operating a golf course.

In addition, the transaction satisfies one of the explicit exclusions from the definition of a "business opportunity." *See id.* § 523B.1(3)(*b*)(2). Because this transaction involved the sale of a product—the beverage cart—that was substantially similar to the products and services sold by Lake MacBride in connection to its ongoing business—the sale of beverages and other concessions to its golfers—the transaction is explicitly excluded from the definition of a "business opportunity." *Id.* Accordingly, the district court rightly dismissed Lake MacBride's business-opportunity-promotions counterclaim.

**F. Remaining Claims and Affirmative Defenses.** Lake MacBride argues the district court erred in granting summary judgment in favor of Frontier on its affirmative defenses of set-off, sole proximate

cause/negligent supervision, no meeting of the minds, and frustration of purpose because Frontier failed to address these defenses in its motion for summary judgment. In its motion for summary judgment, Frontier gave cursory attention to these defenses by merely stating the defenses "have no legal merit based on the undisputed facts and law of Iowa." The district court granted summary judgment in Frontier's favor without discussing these defenses.

Such a perfunctory statement by Frontier, as the moving party, is insufficient to satisfy the burden it carries of establishing no genuine issue of material fact existed. *Sherwood v. Nissen*, 179 N.W.2d 336, 339 (Iowa 1970) (recognizing, if the moving party has not met his or her burden, he or she is not entitled to summary judgment). Accordingly, we find the district court erred in granting summary judgment in favor of Frontier on these affirmative defenses and upon remand, the district court must rule on the defenses at the appropriate time. *See, e.g., Huffey v. Lea*, 491 N.W.2d 518, 523 (Iowa 1992) (holding, upon remand, district court must rule on party's affirmative defense that it earlier had failed to rule on when dismissing the action).

In its amended answer, Lake MacBride also asserted the counterclaims/third-party claims of fraudulent misrepresentation, equitable fraud, constructive fraud, concert of action, and attempted to pierce the corporate veil. The district court enlarged its ruling to dismiss these counterclaims/third-party claims. Lake MacBride claims the district court erred in dismissing these counterclaims/third-party claims because Frontier never directed a motion for summary judgment at them.

As to the fraudulent misrepresentation, equitable fraud, and constructive fraud claims, Frontier addressed these claims generally in

its motion for summary judgment under the heading "fraud and misrepresentations." Frontier argued because there was no agency relationship between it and Royal Links, "there was no fraud or misrepresentation that is attributable to C and J." The district court found no agency relationship existed and enlarged its ruling to dismiss these claims. However, we have held a genuine issue of material fact exists as to whether Royal Links was acting as an agent of C & J. Accordingly, we find Lake MacBride has generated a genuine issue of material fact as to its counterclaims/third-party claims of fraudulent misrepresentation, equitable fraud, and constructive fraud.

As to Lake MacBride's counterclaim/third-party claim of concert of action and its attempt to pierce the corporate veil, Frontier failed to move for summary judgment on these claims. Thus, the district court erred by enlarging its ruling to dismiss these claims in favor of Frontier. *See, e.g.*, *In re Estate of Campbell*, 253 N.W.2d 906, 907–08 (Iowa 1977) (refusing to grant summary judgment to one who has not requested it). Accordingly, upon remand, the district court must rule on Lake MacBride's concert of action claim and its attempt to pierce the corporate veil at an appropriate time.

## VIII. The Integration Clause and the Parol-Evidence Rule.

Lake MacBride asserts there are facts in dispute that could lead a reasonable finder of fact to believe the lease agreement was not fully integrated and that the parol-evidence rule does not bar the introduction of extrinsic evidence of the agreement. Specifically, Lake MacBride seeks to introduce the program agreement it executed with Royal Links and the statements made by the Royal Links sales representative to show the parties intended Lake MacBride to receive the beverage cart at no cost.

When an agreement is fully integrated, the parol-evidence rule forbids the use of extrinsic evidence introduced solely to vary, add to, or subtract from the agreement. *Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996); *Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 433 (Iowa 1984); *Montgomery Props. Corp. v. Econ. Forms Corp.*, 305 N.W.2d 470, 475–76 (Iowa 1981). When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated. *Whalen*, 545 N.W.2d at 290. Determining whether an agreement is fully integrated is a question of fact, to be determined from the totality of the evidence. *Id.* The presence of an integration clause is one factor we take into account in determining whether an agreement is fully integrated. Nevertheless, the parol-evidence rule does not prohibit the introduction of extrinsic evidence to show "the situation of the parties, . . . attendant circumstances, and the objects they were striving to attain." *Kroblin*, 347 N.W.2d at 433. The parol-evidence rule also does not prohibit the admission of extrinsic evidence to prove fraud in the inducement. *Int'l Milling Co. v. Gisch*, 258 Iowa 63, 71, 137 N.W.2d 625, 630 (1965).

Although the lease agreement contained an integration clause, the parol-evidence rule does not prohibit Lake MacBride from introducing evidence of the Royal Links' program agreement and the sale representative's alleged misrepresentations. Lake MacBride is not seeking to offer this extrinsic evidence to change or vary the meaning of the lease agreement. *See, e.g., Kroblin*, 347 N.W.2d at 433 (holding parol-evidence rule did not bar admission of extrinsic evidence, where evidence was not introduced to change or vary the words of the contract). Instead, Lake MacBride apparently seeks to offer this extrinsic evidence to support its claim that it was fraudulently induced into entering into

the lease agreement based on its belief that, under the totality of the transaction, it would receive the beverage cart at no cost. Accordingly, the parol-evidence rule does not bar the admission of this evidence for this purpose because Lake MacBride seeks to introduce this extrinsic evidence to help prove fraud in the inducement and its expectations from participating in the transaction.

### IX. Attorney Fee Award.

The district court awarded attorney fees to Frontier based upon its entry of judgment in Frontier's favor. On further review, we are vacating the decision of the court of appeals, reversing the judgment of the district court, and remanding the case to the district court for further proceedings consistent with this opinion. Accordingly, we must vacate the court's attorney-fee award because Frontier has not yet recovered a favorable judgment upon the lease agreement. *See* Iowa Code § 625.22 (permitting the court to award reasonable attorney fees when judgment is recovered upon a written contract containing an agreement to pay attorney fees).

### X. Disposition.

Because we have found genuine issues of material fact with regard to some of Lake MacBride's affirmative defenses, counterclaims, and third-party claims, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**