**HEABERLIN FARMS, INC., Appellee,**

v.

**IGF INSURANCE COMPANY, Appellant.**

No. 00–0754.

Supreme Court of Iowa.

April 3, 2002.

R. Jefferson Allen and Elizabeth T. Bufkin of Henke–Bufkin, P.C., Clarksdale, Mississippi, Edward N. McConnell of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellant.

Steven P. Wandro and Sandra K. Lyons of Wandro, Lyons, Wagner & Baer, P.C., Des Moines, for appellee.

LARSON, Justice.

This case raises novel issues involving the right of an insurer to enforce an arbitration clause in an insurance policy in the face of claims by the insured that (1) the Iowa arbitration statute, Iowa Code § 679A.1 (1999), makes the arbitration clause invalid because the insurance policy is a "contract of adhesion," and (2) the Federal Arbitration Act, 9 U.S.C. §§ 1–307, which would otherwise trump the Iowa statute and require enforcement of the clause, is inapplicable because the defendant insurance company has not satisfied the jurisdictional requirement that the relationship was one "involving commerce." The district court denied the insurer's motion to compel arbitration. We reverse and remand for further proceedings.

## I. *Facts and Prior Proceedings.*

The plaintiff, Heaberlin Farms, Inc., bought a multiple-peril crop insurance policy from IGF Insurance Company for the 1999 crop year, covering over 1000 acres of corn in Marion County, Iowa. In June 1999 Heaberlin submitted a notice of claim for "prevented planting," as covered by the insurance policy, on the basis it was too wet for Heaberlin to plant its crops. IGF inspected the fields and determined that the cause of loss was not one covered by the policy. The cause of loss, it said, was flooding from the nearby Red Rock Reservoir, a condition excluded from coverage under the policy. In January 2000 Heaberlin commenced this breach-of-contract action against IGF for failing to pay its claim. IGF filed a motion to compel arbitration and a motion to stay. The district court denied the motions, and IGF appealed. The denial of a motion to compel arbitration is a final judgment for purposes of appeal. *See* Iowa Code § 679A.17(1)(a); *Des Moines Asphalt & Paving Co. v. Colcon Indus. Corp.*, 500 N.W.2d 70, 72 (Iowa 1993), *overruled on*

*other grounds by Wesley Retirement Servs., Inc. v. Hansen Lind Meyer, Inc.,* 594 N.W.2d 22, 29 (Iowa 1999).

## II. *The Issues.*

IGF raises three issues: (1) the Iowa law denying arbitration of adhesion contracts is preempted by the Federal Crop Insurance Act (FCIA), 7 U.S.C. §§ 1501–21; (2) the Iowa arbitration statute is also preempted by the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–307; and (3) the policy was not an adhesion contract so as to be excluded from mandatory arbitration under the Iowa statute.

We reject IGF's first preemption argument (that the Iowa arbitration statute is preempted by the FCIA) because this issue was not raised below. We find it unnecessary to address IGF's third claim (that this policy is not an adhesion contract within the meaning of Iowa Code section 679A.1) because of our view that the FAA preempts the Iowa act.

## III. *The Iowa and Federal Arbitration Statutes.*

The Iowa arbitration statute, Iowa Code § 679A.1, provides in relevant part:

2. A provision in a written contract to submit to arbitration a future controversy arising between the parties is valid, enforceable, and irrevocable unless grounds exist at law or in equity for the revocation of the contract. This subsection shall not apply to any of the following:

a. *A contract of adhesion.*

(Emphasis added.)

Under the FAA, 9 U.S.C. § 2,

[a] written provision in any ... contract *evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

(Emphasis added.)

The FAA has been interpreted to be very broad in its scope. The Supreme Court has stated that "[s]ection 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983), and questions as to whether an issue is arbitrable are to be resolved in favor of arbitration. *Id.* at 24–25, 103 S.Ct. at 941, 74 L.Ed.2d at 785.

The FAA is applicable in state, as well as federal, courts if the interstate nexus requirement is met. *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 271–72, 115 S.Ct. 834, 838, 130 L.Ed.2d 753, 763 (1995); *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1, 12 (1984) ("In enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."). The reason the federal act is enforceable in state court is because Congress intended to place arbitration agreements " 'upon the same footing as other contracts, where [they] belong[ ].' " *Southland,* 465 U.S. at 16, 104

S.Ct. at 861, 79 L.Ed.2d at 15 (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924)); *see also* William G. Phelps, Annotation, *Preemption by Federal Arbitration Act (9 USCS §§ 1 et seq.) of State Laws Prohibiting or Restricting Formation or Enforcement of Arbitration Agreements,* 108 A.L.R. Fed. 179, §§ 2–5, at 187–201 (1992).

The issue remains whether the federal act preempts the Iowa act. It is clear that it does if the policy is a "contract evidencing a transaction involving commerce." *Allied–Bruce Terminix,* 513 U.S. at 272–75, 115 S.Ct. at 839–40, 130 L.Ed.2d at 763–65. In *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 683, 116 S.Ct. 1652, 1654, 134 L.Ed.2d 902, 906 (1996), the Supreme Court said:

> The Federal Arbitration Act ... declares written provisions for arbitration "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Montana law, however, declares an arbitration clause unenforceable unless "[n]otice that [the] contract is subject to arbitration" is "typed in underlined capital letters on the first page of the contract." The question here presented is whether Montana's law is compatible with the federal Act. We hold that Montana's first-page notice requirement, which governs not "any contract," but specifically and solely contracts "subject to arbitration" conflicts with the FAA and is therefore displaced by the federal measure.

(Alterations in original.) (Citations omitted.) The FAA does not exclude adhesion contracts. The Iowa statute, by excluding adhesion contracts, is in conflict with the FAA. Thus, if the federal act is applicable, it preempts the Iowa statute by operation of the Supremacy Clause. Heaberlin argues that the federal act is not applicable here because this contract is not a "transaction involving commerce." That is the key issue in this case.

## IV. *Is This Transaction One Involving Interstate Commerce?*

■ Heaberlin claims IGF has not established an interstate-commerce connection. However, the case the plaintiff relies on to support that argument is not persuasive. The district court in that case, *Booth v. Seaboard Fire & Marine Insurance Co.,* 285 F.Supp. 920, 925 (D.Neb.1968), *rev'd on other grounds,* 431 F.2d 212 (8th Cir. 1970), ruled that an insurance policy did not implicate interstate commerce. However, on appeal the court of appeals did not address the issue of whether the insurance transactions were a part of interstate commerce because neither party had demanded arbitration. *Booth,* 431 F.2d at 215. Contrary to the plaintiff's argument, a substantial weight of authority holds that insurance transactions do involve interstate commerce.

Prior to 1944, a long line of cases had held that insurance policies do not involve interstate commerce. In 1944 the Supreme Court traced the history of the relationship between interstate commerce and the insurance industry beginning with a rejection of any interrelationship in *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357, 361 (1868) (holding that "issuing a policy of insurance is not a part of commerce"), and concluding with a recognition, based on the economic realities of the insurance industry, that the insurance industry inextricably involves interstate commerce. *See United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533,

543–47, 64 S.Ct. 1162, 1168–70, 88 L.Ed. 1440, 1451–54 (1944). There, the Court stated:

> One reason advanced for the rule in the *Paul* case has been that insurance policies "are not quantities to be shipped or forwarded from one State to another." But both before and since *Paul v. Virginia,* this Court has held that Congress can regulate traffic though it consist of intangibles. Another reason much stressed has been that insurance policies are mere personal contracts subject to the laws of the state where executed. But this reason rests upon a distinction between what has been called "local" and what "interstate," a type of mechanical criterion which this Court has not deemed controlling in the measurement of federal power. We may grant that a contract of insurance, considered as a thing apart from negotiation and execution, does not itself constitute interstate commerce. But it does not follow from this that the Court is powerless to examine the entire transaction, of which that contract is but a part, in order to determine whether there may be a chain of events which becomes interstate commerce. Only by treating the Congressional power over commerce among the states as a "technical legal conception" rather than as a "practical one, drawn from the course of business" could such a conclusion be reached. In short, a nationwide business is not deprived of its interstate character merely because it is built upon sales contracts which are local in nature. Were the rule otherwise, few businesses could be said to be engaged in interstate commerce.

*Id.* at 546–47, 64 S.Ct. at 1169–70, 88 L.Ed. at 1453–54 (citations omitted) (footnotes omitted).

In reaching its conclusion that generally the insurance business is a part of interstate commerce, the Court noted the pervasiveness of the insurance industry:

> The modern insurance business holds a commanding position in the trade and commerce of our Nation. Built upon the sale of contracts of indemnity, it has become one of the largest and most important branches of commerce. Its total assets exceed $37,000,000,000, or the approximate equivalent of the value of all farm lands and buildings in the United States. Its annual premium receipts exceed $6,000,000,000, more than the average annual revenue receipts of the United States Government during the last decade. Included in the labor force of insurance are 524,000 experienced workers, almost as many as seek their livings in coal mining or automobile manufacturing. Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business. Insurance touches the home, the family, and the occupation or the business of almost every person in the United States.

*Id.* at 539–40, 64 S.Ct. at 1166–67, 88 L.Ed. at 1450 (footnotes omitted). Comparative figures, nearly sixty years later, would undoubtedly underscore the Court's conclusion.

The Court continued:

> This business is not separated into 48 distinct territorial compartments which function in isolation from each other. Interrelationship, interdependence, and integration of activities in all the states in which they operate are practical aspects of the insurance companies' methods of doing business. A large share of the insurance business is concentrated in

a comparatively few companies located, for the most part, in the financial centers of the East. Premiums collected from policyholders in every part of the United States flow into these companies for investment. As policies become payable, checks and drafts flow back to the many states where the policyholders reside. The result is a continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to the negotiation and execution of policy contracts.... The decisions which that company makes at its home office—the risks it insures, the premiums it charges, the investments it makes, the losses it pays—concern not just the people of the state where the home office happens to be located. They concern people living far beyond the boundaries of that state.

*Id.* at 541–42, 64 S.Ct. at 1167, 88 L.Ed. at 1450–51 (footnote omitted).

As of the early 1990s, eighty-five percent of all federal crop insurance was provided by private insurers throughout the country. In those cases the Federal Crop Insurance Corporation (FCIC), a wholly government-owned corporation established by Congress, acted as reinsurer. *Kansas ex rel. Todd v. United States*, 995 F.2d 1505, 1508 (10th Cir.1993). Such a system, of course, necessitates a flurry of interstate activity relating to federal crop insurance.

The stated purpose of the Federal Crop Insurance Act is "to promote the *national* welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." 7 U.S.C. § 1502(a) (emphasis added). The act envisions cooperation with local cooperative associations, *id.* § 1507(c), and a nationwide system of insurance providing "the Corporation may insure, or provide reinsurance for insurers of, producers of agricultural commodities grown in the United States...." *Id.* § 1508(a)(1). The act covers private insurance providers as well as the national corporation. The act provides "[t]he term 'approved insurance provider' means a private insurance provider that has been approved by the Corporation to provide insurance coverage to producers participating in the Federal crop insurance program established under this chapter." *Id.* § 1502(b)(2). The principal office of the federal corporation "shall be located in the District of Columbia, but there may be established agencies or branch offices elsewhere in the United States under rules and regulations prescribed by the Board." *Id.* § 1503. The Corporation requires that records and reporting information be provided to it. *See, e.g., id.* § 1508(f)(3) (requiring information necessary to obtain catastrophic risk protection). The activities of the FCIC and its affiliates clearly constitute "the continuous and indivisible stream of intercourse among the states composed of collections of premiums, payments of policy obligations, and the countless documents and communications which are essential to the negotiation and execution of policy contracts." *See South–Eastern Underwriters*, 322 U.S. at 541, 64 S.Ct. at 1167, 88 L.Ed. at 1451.

Federal crop insurance legislation is based on the authority of Congress under the Commerce Clause. It has been said that the high-water mark in Congress's exercise of its power under the Commerce Clause is *Wickard v. Filburn*, 317 U.S.

111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *See United States v. Lopez*, 514 U.S. 549, 560, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626, 638 (1995) (*Wickard* "is perhaps the most far-reaching example of Commerce Clause authority over interstate activity. . . ."). In *Wickard* the Supreme Court upheld a federal law regulating the allowable acreage that could be planted to wheat, even though Filburn's harvest of wheat was for purely personal use. The court justified the enactment of the allocation law on the basis that even locally grown and consumed wheat would impact on the total amount of wheat shipped and would thus have a sufficient impact on interstate commerce. According to the Court, the statute was a valid exercise of Congress's power under the Commerce Clause. *Wickard*, 317 U.S. at 125, 63 S.Ct. at 89, 87 L.Ed. at 135.

As a result of *Wickard*, a very broad view of Commerce Clause power persisted for many years, but the Supreme Court "ended this fifty-eight-year quiescence" in *Lopez*. *See United States v. Taylor*, 226 F.3d 593, 598 (7th Cir.2000). *Lopez* involved a federal statute that criminalized the possession of guns in a school zone. The Supreme Court struck down the statute because it "is a criminal statute . . . that has nothing to do with 'commerce' or any sort of economic enterprise." *Lopez*, 514 U.S. at 561, 115 S.Ct. at 1630–31, 131 L.Ed.2d at 638.

Similarly, in the more recent case of *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Court struck down part of the Violence Against Women Act, 42 U.S.C. § 13981, which created civil liability for the commission of an illegal gender-based act. In doing so, the Supreme Court noted "the noneconomic, criminal nature of the con-

duct at issue." *Morrison*, 529 U.S. at 610, 120 S.Ct. at 1750, 146 L.Ed.2d at 671.

The Supreme Court has made it clear that, when a statute regulates purely economic matters, as in *Wickard*, it is not subject to the constitutional infirmities of the statutes in *Lopez* and *Morrison*. *See generally* Christy H. Dral & Jerry J. Phillips, *Commerce by Another Name: The Impact of* United States v. Lopez *and* United States v. Morrison, 68 Tenn. L.Rev. 605, 606 (2001). As the Court said in *Lopez*, the school-zone gun law

> is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms. [The gun statute] is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Lopez*, 514 U.S. at 561, 115 S.Ct. at 1630–31, 131 L.Ed.2d at 638–39 (footnote omitted). The Court noted, "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560, 115 S.Ct. at 1630, 131 L.Ed.2d at 638.

Similarly, in *Morrison*, the Court distinguished criminal statutes from other statutes purporting to be based on Commerce Clause authority on the ground that the criminal statutes lacked the economic nexus of such cases as *Wickard*. It said:

> *Lopez's* review of Commerce Clause case law demonstrates that in those cases

where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor.

*Morrison*, 529 U.S. at 611, 120 S.Ct. at 1750, 146 L.Ed.2d at 692.

The sale of federal crop insurance clearly has a sufficient economic nexus with interstate commerce, as we have described above, to invoke the arbitration provisions of 9 U.S.C. § 2, despite the limitations recognized by the Supreme Court on Commerce Clause authority as discussed in *Lopez* and *Morrison*. As the federal act applies, and is in conflict with the provisions of our state arbitration statute exempting adhesion contracts, it was error for the district court to refuse to enforce the arbitration clause. We reverse and remand for further proceedings.

**REVERSED AND REMANDED.**