# IN THE SUPREME COURT OF IOWA

No. 12–0790

Filed April 5, 2013

**BARTLETT GRAIN COMPANY, LP,**

Appellant,

vs.

**STEVEN CARL SHEEDER**
and **MAUREEN JEANETTE PACE,**

Appellees.

Appeal from the Iowa District Court for Montgomery County, Kathleen A. Kilnoski, Judge.

A buyer of grain appeals a district court order denying its application for confirmation of an arbitration award against a grain seller. **REVERSED AND REMANDED WITH DIRECTIONS.**

Erin C. Herbold, Mark C. Feldmann, and Eldon L. McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for appellant.

David L. Leitner of Leitner Law Office, West Des Moines, for appellees.

Douglas E. Gross, Adam C. Gregg, and Jonathan M. Gallagher of Brown, Winick, Graves, Gross and Schoenebaum, P.L.C., Des Moines, for amicus curiae Agribusiness Association of Iowa.

Judd N. Kruse of Kruse & Dakin, L.L.P., Des Moines, and Marc L. Fleischaker, Donald C. McLean, and Jennifer S. Allen of Arent Fox LLP, Washington, D.C., for amicus curiae National Grain and Feed Association.

**MANSFIELD, Justice**.

Is there an enforceable agreement to arbitrate if two parties agree over the phone to a sale of grain and later confirm that agreement with a signed, written document containing an arbitration clause that was not part of the phone conversation? That is the question we must answer in this case. Bartlett Grain Co. (Bartlett) appeals the district court's denial of its application to confirm an arbitration award against Steven Sheeder.

Because the parties signed final, written documents that included arbitration clauses, we conclude valid agreements to arbitrate existed. Accordingly, we reverse the district court's order with directions to confirm the arbitration award in favor of the grain buyer.

## I. Facts and Procedural Background.

In 2010, Steven Sheeder entered into eight oral agreements with Bartlett for the sale of a total of 155,000 bushels of corn to be delivered at various future dates. Sheeder stated in an affidavit that "[t]he only terms of the oral contract were price and quantity and anticipated delivery date. No other terms were discussed or agreed upon."

Following each of the oral agreements, Bartlett sent to Sheeder a two-page "Purchase Confirmation" for both parties to sign. It is undisputed that both Sheeder and Bartlett signed the confirmations. All were identical, except for variations in price, quantity, and delivery dates. The quantity ranged from 10,000 to 45,000 bushels; the price from $3.77 to $4.26 per bushel. The delivery dates were in 2011, generally after the 2011 harvest. Each of these two-page documents contained the following statement on the first page:

> THE LAW RECOGNIZES TELEPHONE TRANSACTIONS TO BE LEGALLY BINDING. CONTRACTS ARE SENT TO CONFIRM PHONE CONVERSATIONS, ENSURING THAT BOTH PARTIES UNDERSTAND THE TERMS, AND AS A

MATTER OF RECORD. PLEASE REVIEW THIS CONFIRMATION AND NOTIFY BARTLETT IF THERE ARE ANY TERMS YOU DO NOT UNDERSTAND OR THAT MAY BE IN ERROR.

. . . PLEASE SIGN AND RETURN ONE COPY IMMEDIATELY UPON RECEIPT.

Just below that appeared the signatures of Sheeder and a Bartlett representative.

Page two began with an introductory paragraph:

Bartlett is sending you this document to confirm its Contract to purchase grain, feed or feed ingredients according to the terms set forth on both sides of this document. Failure to advise Bartlett immediately of any discrepancies, objections to or disagreement with this confirmation of the terms constitutes acceptance of those terms.

There then followed various terms, numbered 1 through 16, relating to the sale of grain. The first term—the subject of this appeal—read as follows:

1. NGFA Trade and Arbitration Rules. Unless otherwise provided herein, this Contract is subject to the Trade Rules of the National Grain Feed Association (NGFA) current on the date of this Contract, which rules are incorporated here in by reference. All disputes RELATING to Contract creation, performance and liability will be arbitrated according to the Arbitration Rules of the NGFA. The decision and award of the NGFA arbitrators will be final and binding on both parties. Judgment upon an NGFA arbitration award may be entered and enforced in any court of competent jurisdiction. Copies of the NGFA Trade and Arbitration Rules are available from Buyer or from www.ngfa.org.

The next term contained an integration clause that stated: "2. Final and Complete Agreement. This contract represents the final, complete and exclusive statement of agreement between the parties."

On or about April 19, 2011, Bartlett maintains that it discovered "reasonable grounds for insecurity" as to whether Sheeder was going to perform the contracts by delivering grain at the contracted prices. *See*

Iowa Code § 554.2609(1) (2011); *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 466–68 (Iowa 2000) (discussing a grain buyer's reasonable grounds for insecurity). Accordingly, Bartlett requested adequate assurance of performance. *See* Iowa Code § 554.2609(1). Allegedly, Sheeder did not provide such assurance and thereby repudiated the contracts. *See id.* § 554.2609(4). Bartlett thereafter initiated an NGFA arbitration to recover damages from Sheeder for breach of the contracts.

Pursuant to NGFA arbitration rules, Bartlett filed a complaint with the NGFA against Steven Sheeder on May 19.[1] The NGFA responded by sending Bartlett an arbitration services contract, which Bartlett executed and returned with the required arbitration fee. Meanwhile, the NGFA sent by certified mail a notice letter to Sheeder that included copies of Bartlett's complaint and attachments, the NGFA trade rules, and the NGFA arbitration rules. Sheeder signed for this mailing on June 20.

After receiving the signed arbitration services contract and fee from Bartlett, the NGFA sent the same contract by FedEx to Sheeder asking him to execute it and pay his fee within fifteen days as required by NGFA arbitration rules. Sheeder failed to respond to this letter. A follow-up FedEx mailing by the NGFA to Sheeder in July also drew no response. Finally, on August 4, the NGFA sent Sheeder yet another FedEx letter asking him once more to sign the arbitration contract and pay the required fee within fifteen days. This letter warned,

> Based upon the lack of any response from you thus far, we must anticipate that you do not intend to respond. ***This is***

---

[1]Bartlett also named Maureen Pace as a defendant in the arbitration proceeding and obtained an award against her. Pace is Sheeder's ex-wife. However, Pace did not sign the purchase confirmations, and Bartlett has abandoned further proceedings against her. To simplify matters, we will only discuss Bartlett's efforts to recover from Sheeder.

***our last attempt to elicit a response from you. A
default judgment may be entered against you at any
time, which the Plaintiff may enforce in a court of law.***

When Sheeder failed to respond to this letter, the NGFA, on October 5, entered a default judgment for Bartlett in the amount of $406,475, the sum calculated by Bartlett as due for breach of the eight contracts.[2]

On November 15, 2011, Bartlett filed an application with the Montgomery County District Court for confirmation of the arbitration award. Sheeder filed a resistance to the application on January 23, 2012. He argued there were no written agreements to arbitrate, and, alternatively, the purported agreements to arbitrate were unconscionable.

In reply, Bartlett stated that Sheeder had consented to arbitration by his "signing of the written confirmation on each of the eight grain sales contracts." It also disputed Sheeder's claims that the written agreements to submit to arbitration were unenforceable.

Following a hearing, the district court ordered on March 23, 2012, that Bartlett's application for confirmation of the award be denied. The court concluded there was no enforceable agreement between the parties to arbitrate.

Bartlett now appeals. It contends that Sheeder agreed to arbitrate when he executed the confirmations and that his agreements to arbitrate are not unconscionable.

---

[2]Section 5(e) of the NGFA Arbitration Rules states, in relevant part:

> Where a party fails to pay the arbitration service fee and/or fails to execute the contract for arbitration, the National Secretary may without further submissions by the parties enter a default judgment or such other relief as the National Secretary deems appropriate.

NGFA Trade Rules & Arbitration Rules, Arbitration Rule § 5(e) (2011).

## II.  Scope of Review.

This is an appeal from an order denying confirmation of an arbitration award.  Iowa Code section 679A.17(2) provides that such an "appeal shall be taken in the manner and to the same extent as from orders or judgments in a civil action."  Accordingly, we review the district court's judgment here for errors at law.  *See $99 Down Payment, Inc. v. Garard*, 592 N.W.2d 691, 693 (Iowa 1999).

## III.  Legal Analysis.

**A. Was There an Agreement to Arbitrate?**  Iowa law favors arbitration.  *$99 Down Payment*, 592 N.W.2d at 694.  "Arbitration avoids the expense and delay generally associated with traditional civil litigation, and draws on experts in the specific area of the dispute to resolve the matter."  *Id.*  Hence, "every reasonable presumption will be indulged in favor of the legality of an arbitration award."  *Humphreys v. Joe Johnston Law Firm, P.C.*, 491 N.W.2d 513, 514 (Iowa 1992).

Nonetheless, the court must make two threshold determinations before enforcing an arbitration award: "whether there is a valid agreement to arbitrate and . . . whether the controversy alleged is embraced by that agreement."  *Lewis Cent. Educ. Ass'n v. Lewis Cent. Cmty. Sch. Dist.*, 559 N.W.2d 19, 21 (Iowa 1997).  Here, the dispute centers on the former determination.

Unless there is some ground "at law or in equity for the revocation of the written agreement," a written agreement to arbitrate is enforceable.  Iowa Code § 679A.1(1).  Following arbitration, a party may apply for confirmation of the award to the district court, which "shall confirm an award" unless certain grounds exist to vacate the award.  *See id.* §§ 679A.11–.13.  One such ground is if "[t]here was no arbitration agreement, the issue was not adversely determined in proceedings [to

compel or stay arbitration], and the party did not participate in the arbitration hearing without raising the objection." *Id.* § 679A.12(1)(*e*).[3]

Sheeder argued below that there was no written arbitration agreement, and the district court agreed, based on "ordinary contract principles." We must determine whether the district court erred in determining that "there is simply not adequate evidence that Steven Sheeder and Bartlett entered a written arbitration agreement."

This case involved the sale of grain, which is a good. Accordingly, the UCC governs. *See St. Ansgar Mills, Inc. v. Streit*, 613 N.W.2d 289, 293–94 (Iowa 2000) (applying the UCC statute of frauds in a dispute regarding the sale of corn). Iowa Code section 554.2204(1) states, "A contract for sale of goods may be made in any manner sufficient to show agreement . . . ."

"Article 2 does not, of course, entirely eliminate the common law of contracts." *Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 578 (Iowa Ct. App. 2001) (citing Iowa Code § 554.1103). "[A] valid contract must consist of an offer, acceptance, and consideration." *Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009). These elements are present in the written confirmations that contained the arbitration clauses. Both parties signed the confirmations, and they imposed reciprocal obligations on both parties. Hence, the basic prerequisites for an enforceable written agreement have been met.

Sheeder argues that the original oral agreements were the only binding contracts and that the documents later signed by both parties

---

[3]Our decision solely involves Iowa law. Neither party has argued that the Federal Arbitration Act applies here or preempts Iowa law. *See* 9 U.S.C. §§ 1–16; *see also Heaberlin Farms, Inc. v. IGF Ins. Co.*, 641 N.W.2d 816, 823 (Iowa 2002) (finding that Iowa Code section 679A.1(2)(*a*) was preempted by the FAA to the extent it does not enforce arbitration agreements in "adhesion contracts").

were merely "confirmations" without legal effect.[4]  Yet, he has the law backwards.  Iowa Code section 554.2202 states, in relevant part:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement . . . .

Thus, section 554.2202 indicates that a prior oral agreement cannot be used to contradict terms "set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein."

On this record, there is no doubt that the confirmations signed by both parties were "intended by the parties as a final expression of their agreement with respect to such terms as are included therein."  Iowa Code § 554.2202.  Each of these documents contained an integration clause, which we have said is "one factor we take into account in determining whether an agreement is fully integrated."  *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011).

---

[4]Sheeder argues Bartlett did not preserve error on any argument relating to "the doctrine of merger and the other issues arising from the Uniform Commercial Code" because it did not raise them before the district court.  We disagree.

Apart from unconscionability, Sheeder's argument below was that he had only entered into oral agreements and that the subsequent written confirmations did not amount to contracts in and of themselves.  Bartlett disagreed and insisted the written confirmations were valid written agreements to arbitrate.  Both parties presented their written positions in a fairly conclusory fashion, and neither cited to specific provisions of the Uniform Commercial Code.  Yet, it was not necessary for Bartlett to do so to alert the court of its essential claim that there was an enforceable written agreement to arbitrate.  *See Collister v. City of Council Bluffs*, 534 N.W.2d 453, 454–55 (Iowa 1995) (holding that the city preserved error on a statutory immunity argument by claiming at trial, without citing the statute, that there was no duty to warn the plaintiffs).  On appeal, both parties have elaborated their positions with UCC and additional case law citations.  We can resolve the parties' dispute as framed below with the benefit of the additional legal briefing they have provided in this court.

For present purposes, though, we need not determine whether the confirmations were "fully integrated." Because Sheeder is trying to *contradict* a term of the written confirmations (i.e., the arbitration clause), not merely *supplement* that term, we need only decide whether the confirmations were "partially integrated," that is, whether they were intended as a final expression "with respect to such terms as are included therein." *Cf.* Iowa Code § 554.2202(2) (excluding even "consistent additional terms" when the writing was "intended also as a complete and exclusive statement of the terms of the agreement"—i.e., a full integration). *See also* 1 James J. White, et al., *Uniform Commercial Code* § 3:14 (6th ed. 2012) (stating that "even if the judge decides that the writing is not complete and exclusive, yet decides that it is a final written expression as to some terms, evidence of contradictory *prior or contemporaneous* terms may not be admitted").

We have no doubt on this record that the confirmations were intended as a final expression of at least the terms contained therein. The second page began, "Bartlett is sending you this document to confirm its Contract to purchase grain, feed or feed ingredients according to the terms set forth on both sides of this document. Failure to advise Bartlett immediately of any discrepancies, objections to or disagreement with this confirmation of the terms constitutes acceptance of those terms." The first page also advised the seller to "REVIEW THIS CONFIRMATION AND NOTIFY BARTLETT IF THERE ARE ANY TERMS YOU DO NOT UNDERSTAND OR THAT MAY BE IN ERROR." Although Sheeder contends the written confirmations "contained clauses and provisos not included within the [oral] contract," he did not object to any of those clauses and provisos, but instead signed and returned each written confirmation.

Sheeder is not trying to "supplement" the written confirmations. *See C-Thru Container Corp. v. Midland Mfg. Co.*, 533 N.W.2d 542, 544 (Iowa 1995) (holding that even a fully integrated agreement may be supplemented by usage of trade). Rather, Sheeder is trying to replace the arbitration clause with its polar opposite—the lack of an arbitration clause. The parol evidence rule exists to prevent this result. *See id.* (citing Iowa Code § 554.2202). Accordingly, we reject Sheeder's contention that there was no written arbitration agreement between the parties.

We also find persuasive similar cases that have declined to give effect to a prior telephonic agreement lacking an arbitration clause when a later written one including an arbitration clause exists. In *T & R Enterprises, Inc. v. Continental Grain Co.*, a buyer placed feed corn orders over the telephone with the seller. 613 F.2d 1272, 1273–74 (5th Cir. 1980). Later, the seller sent confirmation slips, which the buyer signed and returned to the seller. As here, "arbitration was not mentioned in any of the telephone conversations." *Id.* And as here, the confirmations "contained a provision for the settlement of any dispute arising under the contracts by arbitration" by the NGFA. *Id.* at 1274. When a dispute arose, the seller moved to stay court proceedings, and the district court granted its motion. *Id.* Arbitration "resulted in an award adverse to [the buyer]," which challenged the seller's motion to confirm the arbitration award. *Id.* at 1275.

On the question of whether an agreement to arbitrate existed, the court found the buyer's signature on the written confirmations dispositive:

> The only item in the record approaching "an unequivocal denial that the agreement to arbitrate was made" is T & R's assertion that it believed the telephone conversations with

> Continental's agent constituted the real contracts and that the subsequently exchanged signed confirmation slips cannot modify or add essential terms. This argument is contrary to *the universally prevailing rule that, absent allegations of misrepresentation, fraud, or deceit, one who executes a written contract is bound by its terms.* This court has expressly held that this principle applies to prevent a party from avoiding the effect of his written acceptance of a contract which expressly, above his signature, on the face of the contract, incorporates the provisions on the reverse side including promises to arbitrate.

*Id.* at 1278 (emphasis added). Accordingly, the Fifth Circuit held, as a matter of law, that an enforceable agreement to participate in NGFA arbitration existed. *Id.*

In another instructive case, a farmer agreed to sales of corn over the phone while later signing purchase and confirmation forms that included NGFA arbitration clauses. *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 313 (6th Cir. 1998). When the farmer later sought to avoid arbitration, the Sixth Circuit rejected the farmer's argument that this was a "Battle of the Forms" issue. *Id.* at 326. Instead, it found that

> by signing each and every written "Purchase Contract and Confirmation," Horton Farms expressly assented to the additional terms, material or not. . . . . Mr. Horton received the document, supposedly read it, and signed it on behalf of Horton Farms, thereby affirmatively agreeing to the terms contained therein.

*Id.* The Sixth Circuit also rejected the argument that the farmer could avoid the effect of the arbitration clause because it "did not read it or thought that its terms were different." *Id.* at 326–27; *see also Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011) (noting that "[it] is well-settled that failure to read a contract before signing it will not invalidate the contract" (citation and internal quotation marks omitted)).

Citing *McCubbin Seed Farm, Inc. v. Tri-Mor Sales, Inc.*, 257 N.W.2d 55 (Iowa 1977), Sheeder argues that written confirmations are meant to

satisfy the UCC statute of frauds and do not by themselves prove the existence of a contract. However, *McCubbin* is inapposite here. It involved a confirmatory memorandum sent by one party, and never answered by the other. *See McCubbin*, 257 N.W.2d at 56, 59. That scenario, we pointed out in *McCubbin*, is recognized in Iowa Code section 554.2201 as a potential exception to the statute of frauds. *Id.* at 58. Yet we noted, "Nothing in the section makes a written confirmation binding on either party, simply because it is not responded to." *Id.* We elaborated, "To be sure, the writing may be very useful evidence against its author, or against its recipient under the merchant rule; but the contract must nonetheless be proved by the one alleging it." *Id.*

*McCubbin* is simply not on point. This is not a case where a merchant sent a written confirmation and heard nothing back. Both parties signed the confirmation. The writing signed by both parties itself establishes the existence of a contract.

Finally, the UCC rule on modifications leads us to the same conclusion that Bartlett and Sheeder entered into written agreements to arbitrate. Assuming that the parties initially entered into binding oral agreements that did not include arbitration clauses, those agreements were modified by the later signed writings. *See* Iowa Code § 554.2209(1) (recognizing contract modifications and stating that "[a]n agreement modifying a contract within this Article needs no consideration to be binding"). The Sixth Circuit addressed this issue on nearly identical facts in *Andersons*.

> As an initial matter, we note that under Michigan law, a sales contract may be modified without additional consideration. Thus, Horton Farms' contention that the preexisting oral contracts did not include an agreement to arbitrate does not resolve this matter.

*Andersons*, 166 F.3d at 326 (internal citation omitted).

**B. Is the Agreement to Arbitrate Unconscionable?** Sheeder has also urged that even if an agreement to arbitrate existed, it was nonetheless unenforceable on account of its unconscionability. *See* Iowa Code § 679A.1(1) (stating that a written agreement to arbitrate shall not be enforced when "grounds exist at law or in equity for the revocation of the written agreement"); *see also id.* § 554.2302(1) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.").

"A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand." *C & J Vantage,* 795 N.W.2d at 80. In determining whether a contract is unconscionable, we examine factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *Id.* (quoting *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co.,* 227 N.W.2d 169, 181 (Iowa 1975)). "However, the doctrine of unconscionability does not exist to rescue parties from bad bargains." *Id.*; *see also Home Fed. Sav. & Loan Ass'n of Algona,* 357 N.W.2d 613, 619 (1984) (quoting comment 1 to this section of the UCC, which provides that "[t]he principle is one of the prevention of oppression and unfair surprise . . . and not . . . disturbance of allocation of risks because of superior bargaining power").

There are two generally recognized components of unconscionability: procedural and substantive. The former includes the existence of factors such as "sharp practices[,] the use of fine print and

convoluted language, as well as a lack of understanding and an inequality of bargaining power." *In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008) (citation and internal quotation marks omitted). The latter includes "harsh, oppressive, and one-sided terms." *Id.* (internal quotation marks and citation omitted). Whether an agreement is unconscionable must be determined at the time it was made. *See* Iowa Code § 554.2302(1); *see also C & J Vantage*, 795 N.W.2d at 81.

Sheeder argued below, without any specific support, that he had no bargaining power compared to the "corporate giant" Bartlett.[5] But Sheeder did not deny he could have sought out other buyers. Grain is a commodity. *See C & J Vantage*, 795 N.W.2d at 81 (rejecting an unconscionability claim where "[t]here is no evidence of unequal bargaining power between the parties or a lack of understanding on the part of Lake MacBride."); *see also Andersons*, 166 F.3d at 324 (rejecting a procedural unconscionability argument, in part, because "Horton Farms has failed to present evidence that it searched for other alternatives and that there were none"). Sheeder further insisted, without evidentiary support, that "no negotiation was allowed." Still, the confirmations invited Sheeder to notify Bartlett if he disagreed with any terms, did not understand any of them, or believed any of them were in error. *See Andersons*, 166 F.3d at 325 (noting a similar warning as support for its holding that there was no procedural unconscionability). Despite these invitations to alert Bartlett of any disagreement, no indication exists that Sheeder made any attempt to negotiate.

---

[5]The record suggests that Sheeder's farming operation is substantial, since he contracted to sell 155,000 bushels of corn, all but 10,000 of which was to be delivered at the conclusion of the 2011 crop year.

Sheeder also argued the NGFA arbitration fee was unfair. The NGFA Arbitration Rules provide that "each disputant must pay an arbitration service fee" of $900, plus one-half percent of the claim. NGFA Trade Rules & Arbitration Rules, Arbitration Rule § 5(c). In this case, that would amount to a $2932.38 fee, on a claim of $406,475. We cannot conclude that this level of fee would preclude access to justice in a commercial case where 155,000 bushels of corn and over $400,000 are at issue. *See Andersons*, 166 F.3d at 314 (rejecting unconscionability arguments in a NGFA arbitration clause case in which the grain seller's fee was $1500 and the award was $271,030.44). Sheeder does not contend he could not afford the fee and has not provided any evidence, beyond the amount of the fee itself, to establish it was unconscionable. *See Faber v. Menard, Inc.*, 367 F.3d 1048, 1053 (8th Cir. 2004) (noting in an employment case that "[a] fee-splitting arrangement may be unconscionable if information specific to the circumstances indicates that fees are cost-prohibitive and preclude the vindication of statutory rights in an arbitral forum," but "[t]he burden of showing that arbitrators' fees will be cost-prohibitive falls on the party seeking to avoid arbitration" and must be "more than just a hypothetical inability to pay"); *Harrington v. Pulte Home Corp.*, 119 P.3d 1044, 1056 (Ariz. Ct. App. 2005) (rejecting an argument that fees were prohibitive and unconscionable, despite plaintiffs' claim that they could not afford arbitration, because "[t]he affidavits offer no specific facts regarding appellees' financial situations, only conclusory statements"); *Shamrock Foods Co. v. Munn & Assocs., Ltd.*, ___ S.W.3d ___, ___, No. 06–12–00081–CV, 2013 WL 150810, at *6–7 (Tex. App. Jan. 15, 2013) (rejecting a fee-based unconscionability claim because "arbitration agreements are

enforceable in the absence of individualized evidence to establish that the costs of arbitration are prohibitive").

Sheeder also insisted that Bartlett "sprang" the arbitration clauses upon him after the parties had entered into their oral agreements. However, Sheeder does not say in his affidavit that he failed to read the clause; after all, he had eight opportunities to do so. In any event, "a failure to fully read and consider the contract cannot relieve him of its provisions." *Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 486 (Iowa 1999). Furthermore, the arbitration provision was not hidden or obscured. Each confirmation was only two pages long, with a clear indication that the first page (the signature page) was "Page # 1 of 2." The arbitration clause appeared as term number one at the top of the second page and stated directly that disputes would be "arbitrated according to the Arbitration Rules of the NGFA" and "[t]he decision and award of the NGFA arbitrators will be final and binding on both parties." *Cf. Timmerman v. Grain Exch., LLC*, 915 N.E.2d 113, 120–21 (Ill. App. Ct. 2009) (holding that the party "cannot fairly be said to have been aware" of an agreement to arbitrate where "[t]he contracts in the case at bar did not themselves mention arbitration, and the Rules, which contained the arbitration provision, had not been provided to or made available to the plaintiffs before they signed the contracts"). *But see Bryant*, 595 N.W.2d at 486–87 (holding that an employee was bound to arbitrate a claim against his employer even though the arbitration provision was not found in the document he signed and noting he could have read the NASD Code of Arbitration, which was incorporated into his application).

Finally, Sheeder argued that the NGFA arbitration process itself was biased because the NGFA is Bartlett's "surrogate" and Bartlett is a member of the NGFA whereas Sheeder is not. The NGFA's rules appear

to militate against the possibility of direct bias against Sheeder, and he has not provided any evidence that such bias existed. The NGFA Arbitration Rules state that arbitrators

> should be commercially disinterested with respect to the particular dispute intended to be presented to him for judgment. If an individual arbitrator changes employment or affiliation as an active partner, principal, officer or director from one member firm to another member firm, the individual must continue to be commercially disinterested or be replaced.

NGFA Trade Rules & Arbitration Rules, Arbitration Rule § 4(b)(2).

Sheeder has not pointed to any evidence that suggests such direct bias slipped through the cracks here. Instead, he appears to advance an argument of systemic bias, stemming from Bartlett's membership in the NGFA. A federal district court rejected a similar argument in a case concerning the issue of bias under the Federal Arbitration Act:

> [The Plaintiffs] do not mean by this that any of the *arbitrators* is biased in the sense that he has a stake in the outcome. The argument, rather, is that approximately half of the [NGFA]'s members use [similar] contracts, and the Association has filed *amicus* briefs arguing that these contracts comply with federal law. It follows, plaintiffs insist, that the Association cannot conduct arbitration impartially. This is functionally the same as arguing that because the United States depends on tax revenues, and has a mammoth bureaucracy (the IRS) devoted to collecting hundreds of billions of dollars annually, federal judges cannot be impartial in tax cases. No sensible person uses this definition of partiality, however.

*Nagel v. ADM Investor Servs. Inc.*, 65 F. Supp. 2d 740, 745 (N.D. Ill. 1999), *aff'd*, 217 F.3d 436 (7th Cir. 2000). We agree with this observation and note that Sheeder's argument, if accepted, would call into question other alternative dispute resolution forums such as the Financial Industry Regulatory Authority.

We are not able to conclude that the arbitration clause was even a "bad bargain" for Sheeder. *See C & J Vantage*, 795 N.W.2d at 81 (finding an agreement not unconscionable even though it "ultimately amounted to a bad bargain"). For all we know, Sheeder had no viable defense on the merits and would have had the same final judgment entered against him—earlier—if sued in district court.

Sheeder's arguments are not new. In a number of cases from other jurisdictions, courts have declined to vacate NGFA arbitration awards based on assertions that the process is unconscionable, biased, or otherwise unfair. *See Hoffman v. Cargill Inc.*, 236 F.3d 458, 463 (8th Cir. 2001) (reversing district court's order vacating an NGFA arbitration award and noting that "[n]othing compels us to conclude that this process was fundamentally unfair"); *Harter v. Iowa Grain Co.*, 220 F.3d 544, 557 (7th Cir. 2000) (rejecting Federal Arbitration Act-based assertion that NGFA arbitration involved bias against farmers); *Andersons*, 166 F.3d at 323–26 (rejecting procedural and substantive unconscionability arguments against a contract calling for NGFA arbitration, and noting "the NGFA rules provide that the arbitrators may not themselves have a commercial interest in a particular dispute"); *Nagel*, 65 F. Supp. 2d at 744–46 (upholding NGFA arbitration agreements under the Federal Arbitration Act and overruling the argument that NGFA arbitration would be biased because the arbitrators were grain merchants); *In re Robinson*, 256 B.R. 482, 487 (Bankr. S.D. Ohio 2000) (rejecting a debtor's objection to an NGFA arbitration award based on concerns of systemic bias), *aff'd*, 265 B.R. 722 (B.A.P. 6th Cir. 2001), *aff'd on other grounds*, 326 F.3d 767 (6th Cir. 2003); *Andersons, Inc. v. Crotser*, 7 F. Supp. 2d 931, 933 (W.D. Mich. 1998) (holding that a contract is arbitrable, despite unconscionability concerns, because "[t]he

record shows that Crotser makes these allegations with regard to the entirety of the contracts at issue, rather than only with regard to the arbitration clauses contained in those contracts"); *Bunge Corp. v. Williams*, 359 N.E.2d 844, 847 (Ill. App. Ct. 1977) (rejecting farmers' argument that an NGFA arbitration clause was unconscionable because it was on the back and they did not consent to it); *Cargill, Inc. v. Poeppelmeyer*, 328 S.W.3d 774, 775–76 (Mo. Ct. App. 2010) (rejecting a wheat seller's adhesion argument regarding a NGFA arbitration clause because the seller failed to meet his burden to produce evidence that the agreement was invalid).

Accordingly, after careful consideration of procedural and substantive factors, we conclude that the written agreements between Sheeder and Bartlett were not unconscionable.

**IV. Conclusion.**

For the foregoing reasons, we reverse the order below and remand this case to the district court with directions to confirm the arbitration award against Sheeder.[6]

**REVERSED AND REMANDED WITH DIRECTIONS.**

---

[6]As noted above, Bartlett has abandoned its appeal as to Pace and we leave that part of the court's order undisturbed.