632 F.2d 51
 29 UCC Rep.Serv. 1497
 LIMITED FLYING CLUB, INC., an Iowa Corporation, James E.
Vining, Vernon H. Witt, and George C. Clausen, Appellees,
v.
Gerald O. WOOD and Eugene O. Wood, d/b/a Wood Aviation, Appellants.
 No. 79-2064.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1980.
Decided Sept. 16, 1980.
 
 Richard C. Henry, Lansdale, Henry & Kneip, Tucson, Ariz., for appellants.
 G. Wylie Pillers, III, Pillers, Pillers & Pillers, Clinton, Iowa, for appellees.
 Before HEANEY and BRIGHT, Circuit Judges, and HUNGATE, District Judge.*
 HEANEY, Circuit Judge.
 
 
 1
 Limited Flying Club, Inc., and its three members brought this diversity action alleging fraudulent misrepresentation and breach of express and implied warranties in connection with the sale of a used airplane by Gerald and Eugene Wood. The case was tried to a magistrate,[1] sitting without a jury, who dismissed the warranty counts but awarded compensatory and punitive damages for fraud. The district court[2] adopted the magistrate's findings. We reverse and remand for consideration of damages in connection with the claim of breach of express warranty.
 
 
 2
 We summarize the facts in the light most favorable to the magistrate's findings. In the spring of 1973, Eugene Wood purchased a 1965 Mooney Mark IV airplane in Tucson, Arizona.[3] Prior to the purchase, the plane was involved in two forced "wheels up" landings. In the most recent, the plane's surface and structure were extensively damaged. The airplane was towed to a warehouse hangar operated by Wood at Ryan Field, an airport near Tucson. Eugene Wood then arranged for his son, Gerald, and George Mickelson, a mechanic licensed by the Federal Aviation Administration, to repair the aircraft.[4] Gerald and Mickelson inspected the damage to the airplane, planned the repairs and ordered the necessary parts. In May, 1973, Gerald attended aviation school and in June, he passed the FAA-required examination and received his Airframe and Powerplant (A & P) license authorizing him to make major aircraft repairs. Gerald and Mickelson removed the skins from the wings and belly of the plane and made repairs and replaced parts in many areas. Certain repairs and alterations were major, including the installation of an engine; the repair of a structural rim in the right wing; the repair and replacement of wing skins and inspection covers; the replacement of belly fairings, a former assembly, a bulkhead, fairings, and a panel assembly; the replacement of belly skins, fuselage bottom skins and bulkheads; the replacement of landing gear linkage; the replacement of elevation linkage; and the installation of replacement retroacting links. These repairs were itemized in the airplane's logbook. Form 337, which is required by the FAA to be filed for each major repair, was filed only for the repair of the structural rim in the right wing.
 
 
 3
 Mickelson, who held an Inspection Authorization (I.A.) license, approved and certified the airplane as airworthy in July, 1974. The airplane was again certified as airworthy in August, 1975, by David Ateah, who also held an I.A. license. Ateah was employed by Eugene Wood to inspect the airplane and was paid $35 for the two and one-half to three-hour inspection. Eugene flew the plane frequently after its return to service in 1974, taking his family with him on some trips and flying for distances of up to 1,200 miles.
 
 
 4
 In late December of 1975, appellee James Vining was visiting Ryan Field and noticed the Mooney in Wood's hangar. He spoke with an unidentified person who told him the Mooney would be for sale. That person told Vining that the plane had previously been damaged in a belly landing. A few days later, Vining returned to the airfield and met Gerald Wood, who gave him the impression that the airplane was for sale and told Vining he should contact his father. Vining came back a few days later and met Eugene, who told him the plane might be for sale for approximately $13,000. Eugene described the Mooney as a "nice little airplane" and "a good little airplane."
 
 
 5
 In early January, Vining returned to his home in Clinton, Iowa, and agreed with Vernon Witt and George Clausen to jointly purchase Wood's Mooney. Vining made a number of telephone calls to Wood, attempting to arrange the purchase. Eventually, the parties agreed that Vining would travel to Tucson to take possession of the airplane.
 
 
 6
 Vining and a pilot, Leo Cozzolino, arrived in Tucson on June 12, 1976. They visually inspected the airplane and Eugene showed them the logbook, reviewed its entries with them and discussed its two previous belly landings. Eugene suggested that Vining have the airplane inspected and certified before returning to Iowa; however, Vining was anxious to return home and stated his preference to have the inspection done there. Eugene then flew Cozzolino in the Mooney to Tucson International Airport, some fifteen to twenty miles away, to pick up a radio which was to be installed. Cozzolino flew the plane back to Ryan Field and the sale was completed; Vining paid Eugene $14,200 for the airplane and Eugene delivered a Bill of Sale. At Eugene's request, Vining signed a typewritten document that stated as follows:
 
 June 12, 1976
 
 7
 After inspection and trial flight, which have met with my approval, of Mooney N 7875 V, I have agreed to accept the aircraft on an "as is"-"where is" basis, for the amount previously agreed upon.
 
 
 8
 Cozzolino flew the airplane and Vining back to Clinton, Iowa, that day, with intermediate stops in Albuquerque, New Mexico, and Hutchinson, Kansas. During the next six weeks, the airplane was flown sixteen to eighteen hours and no problems arose.
 
 
 9
 The airplane was taken to Straley Flying Service in Clinton, Iowa, in August, 1976, for its annual inspection. The plane was grounded upon discovery of a number of major defects.
 
 
 10
 The plane was then flown by special ferry permit to Niederhauser Airways in Waterloo, the authorized Mooney dealer for the State of Iowa, where it was inspected and the following defects found:
 
 
 11
 1. Tunnel cover bent and ripped loose;
 
 
 12
 2. Wing skins improperly riveted and not fit flush (distorted-not predrilled and aligned);
 
 
 13
 3. Flap hinge ground out;
 
 
 14
 4. Right wing-skins improperly installed;
 
 
 15
 5. Center panel damaged;
 
 
 16
 6. Bottom side leading edge bent-also improper rivets, dents filled with putty and filler both main and center panel (illegal);
 
 
 17
 7. 1/4 to 3/8 slope in stabilizer;
 
 
 18
 8. Compression bend in tubing aft of firewall;
 
 
 19
 9. Illegal spliced stringers;
 
 
 20
 10. Damaged belly panel;
 
 
 21
 11. Defective truss illegally repaired at Station 33 (Exhibit 21);
 
 
 22
 12. Illegally repaired nose gear truss.
 
 
 23
 The plane was then flown, again by special ferry permit, to Kerrville, Texas, where it was inspected by Charles Dugosh, an expert in the construction of Mooney airplanes. He found many defects in the fuselage bottom, the wings, the fuselage, the nose gear truss and the stabilizer. Both Dugosh and Richard Carley, the mechanic who inspected the airplane in Iowa, testified that many of these defects would be observable on a normal annual inspection.
 
 
 24
 At some point after the defects were discovered, Vining telephoned Eugene and told him of the problems with the airplane. Eugene offered to buy the plane back. Vining testified that Eugene offered $10,000, and Eugene testified that he offered another club member $13,000. Vining rejected this offer and had the plane repaired at a cost of $12,534.33.
 
 
 25
 The magistrate found that the plaintiffs had proven fraud by a preponderance of the evidence and awarded compensatory damages of $12,534.33 (the cost of repairs) and punitive damages of $15,000. The district court held that the magistrate had applied an incorrect burden of proof, and remanded the case to the magistrate to determine whether each element of the case had been proven by clear, satisfactory and convincing evidence. The magistrate subsequently found that this required burden of proof had been met and affirmed the damage award. The district court adopted the magistrate's memorandum as supplemented.
 
 I. Fraud
 
 26
 The Woods contend on appeal that the evidence does not support a finding of fraud. A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed * * *." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); see Fed.R.Civ.P. 52(a).
 
 
 27
 The district court correctly determined that Iowa law controlled this diversity action. In order to recover on a fraud action at law in that state, "a plaintiff must establish each of the following elements by a preponderance of clear, satisfying and convincing evidence: (1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." B & B Asphalt Co., Inc. v. T. S. McShane Co., Inc., 242 N.W.2d 279, 284 (Iowa 1976); Grefe v. Ross, 231 N.W.2d 863, 864 (Iowa 1975).
 
 
 28
 The Woods contend that the magistrate clearly erred in finding that the closely related elements of scienter and intent to deceive were proven. Scienter requires a showing that false representations were made with knowledge that they were false, although that requirement may be met by showing that false representations were made "in reckless disregard of their truth or falsity." B & B Asphalt Co., Inc. v. T. S. McShane Co., Inc., supra, 242 N.W.2d at 284; see Hall v. Wright 261 Iowa 758, 156 N.W.2d 661, 667-669 (1968). The magistrate found that scienter and intent to deceive were established by Eugene's representations that the airplane was a "good little airplane" and "airworthy" in light of Eugene's knowledge that the plane had been damaged in two belly landings, that numerous repairs had been made by an unqualified mechanic and that those repairs had not been reported in the airplane's logbook. He found that Eugene Wood "knew or should have known" that the airplane was not airworthy when delivered and that his erroneous statements were "made reprehensible by the degree of danger and risk to which the plaintiffs were exposed when defendants sold them an unairworthy aircraft without warning of its condition." He found that these circumstances made the misrepresentations reckless and therefore they constituted fraud.
 
 
 29
 After carefully considering all the evidence presented to the magistrate, we must conclude that these findings are clearly erroneous. First, it is clear that Eugene told the buyers on more than one occasion about the airplane's previous crash landings and the buyers were aware that repairs had been necessitated by those landings. Second, the evidence does not support the magistrate's conclusion that Eugene should have known that the repairs to the airplane were improperly made. Mickelson, the mechanic, held an I.A. certificate from the FAA, which authorized him to not only repair airplanes but to inspect them and return them to service after the completion of repairs. The only testimony regarding Mickelson's reputation as a mechanic indicated that his reputation was very good and that he had many years experience in repairing and maintaining airplanes. Gerald, who worked with Mickelson in repairing the plane, performed no repairs to the Mooney prior to completing aviation school, passing his examination and receiving his A & P license in June, 1973. He had considerable experience in maintaining airplanes prior to receiving his A & P license. All the experts, including plaintiffs' experts, agreed that an A & P mechanic has the authority to perform any major repair to an airplane. Eugene Wood did not participate in the repairs, nor did he have the capacity to determine whether all the necessary repairs were made or whether those repairs that were made were proper, because he had no mechanical experience or background but knew planes only as a pilot.
 
 
 30
 Eugene's many flights in the airplane show that he relied on the adequacy of the repairs made by mechanics who had exhibited sufficient knowledge to meet FAA qualifications and receive a license. Although this reliance proved to be misguided, the evidence does not show that Eugene Wood had knowledge of the defects or that his statements were made in reckless disregard of the truth or falsity thereof. See B & B Asphalt Co., Inc. v. T. S. McShane Co., Inc., supra, 242 N.W.2d at 284.
 
 
 31
 The evidence also refutes the magistrate's finding that Gerald Wood made numerous major repairs that were not reported in the airplane's logbook. We have examined the logbook and have found in it nearly all of the repairs and parts replacements itemized by the magistrate as having been performed but not recorded in the log. To the extent that the finding of fraud was premised on the failure to record specific repairs in the airplane logbook, then, it is unsupported.
 
 
 32
 In his memorandum, the magistrate also emphasized the mechanics' failure to file Forms 337 with the FAA, as is required for each major repair. While the evidence supports his finding that the proper forms were not filed, this failure does not support the conclusion that Eugene Wood's representations about the condition of the airplane were fraudulent.
 
 II. Express Warranty
 
 33
 The magistrate concluded without discussion that no express warranty was present in this case. We disagree. The magistrate found and the evidence demonstrates that Eugene Wood showed Vining and Cozzolino the airplane logbook, including the certificates of airworthiness, and went over it with them. Vining testified that he relied on the logbook and certificates of airworthiness and it is clear that they became part of the basis of the bargain between the parties.
 
 
 34
 The law governing the creation of an express warranty is set forth in Iowa Code § 554.2313, which is identical to the Uniform Commercial Code provision:
 
 
 35
 (1) Express warranties by the seller are created as follows:
 
 
 36
 (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
 
 
 37
 (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
 
 
 38
 (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.
 
 
 39
 U.C.C. official comment 5 to that section provides that "(a) description need not be by words. Technical specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them."
 
 
 40
 In this case, the seller provided the buyer with the logbook which set forth the repair and inspection history of the airplane. Vining and his pilot examined those entries and relied on the certifications of the airplane as airworthy. Those certifications consequently formed part of the basis of the bargain as a description of the goods, similar to a description that might be provided by a blueprint. Under these circumstances, Eugene expressly warranted the accuracy of that description-the airworthiness of the plane-and is liable for damages arising from the breach of that warranty. Accord, Miles v. Kavanaugh, 350 So.2d 1090 (Fla.App.1977).
 
 
 41
 We reversed the magistrate's finding of fraudulent misrepresentation because the evidence did not demonstrate that Eugene represented the airplane's condition in reckless disregard of the truth or falsity of his representations. To create an express warranty of the plane's airworthiness, however, there is no requirement that Eugene have actual knowledge of the airplane's airworthiness or lack of airworthiness. His representation of the plane as airworthy, based on the description in the logbook, created the warranty.
 
 
 42
 There remains, however, the question of the effect of the "as is"-"where is" disclaimer. It is fairly clear that such a provision operates to disclaim implied warranties. Iowa Code § 554.2316(3)(a).[5] The effect of such a disclaimer on express warranties, however, is less clear. The Iowa Code provides as follows:
 
 
 43
 Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 554.2202) negation or limitation is inoperative to the extent that such construction is unreasonable.
 
 
 44
 Iowa Code § 554.2316(1).
 
 
 45
 Although the disclaimer does not explicitly address the affirmations contained in the logbook, it states in general terms that the buyer accepts the airplane "as is." Because these words tend to limit or negate the seller's warranties, the Code requires that the provision be construed as consistent with the warranty, if such a construction is reasonable. That construction is reasonable under these facts. Eugene presented the logbook to Vining and Cozzolino for their inspection and went over its entries with them prior to the time Vining signed the "as is" disclaimer. Eugene delivered the logbook with the airplane to Vining after the disclaimer was signed. The disclaimer itself made no reference to the description of the airplane contained in the logbook. The "as is" clause, then, can fairly be read to disclaim all implied warranties, leaving the written express warranties of the logbook, including the warranty of airworthiness, intact.
 
 
 46
 The Code's provision on parol evidence does not preclude consideration of the express warranty. That section states:
 
 
 47
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
 
 
 48
 (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.
 
 
 49
 Iowa Code § 554.2202.
 
 
 50
 The "as is"-"where is" clause was certainly not a "complete and exclusive statement of the terms of the agreement" between Eugene and Vining. The description of the airplane as set forth in the logbook is, as we have indicated, a consistent additional term and may be introduced to explain the actual agreement between the parties.
 
 
 51
 We turn, finally, to the question of damages. We are unable to determine on the basis of this record the amount of damages recoverable for the breach of express warranty. The measure of damages for breach of warranty is set out in the Iowa Code as follows:
 
 
 52
 (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
 
 
 53
 (3) In a proper case any incidental and consequential damages under the next section may also be recovered.
 
 
 54
 Iowa Code § 554.2714(2), (3).
 
 
 55
 It remains for the trier of fact to determine the amount of damages under this rule. We note, however, that he should determine whether Eugene offered to buy the airplane back upon learning of its defects and if so, for what price. If he determines that such an offer was made, he should determine whether the damages caused by the breach could have been mitigated by acceptance of that offer.
 
 
 
 *
 The Honorable WILLIAM L. HUNGATE, United States District Judge, Eastern District of Missouri, sitting by designation
 
 
 [1]
 The Honorable Ronald E. Longstaff, United States Magistrate for the Southern District of Iowa
 
 
 [2]
 The Honorable W. C. Stuart, Chief Judge, United States District Court for the Southern District of Iowa
 
 
 [3]
 Although Eugene Wood purchased the airplane, he held it jointly with his son, Gerald Wood
 
 
 [4]
 George Mickelson died prior to the initiation of this lawsuit
 
 
 [5]
 That section provides:
 (U)nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty * * * .