# IN THE SUPREME COURT OF IOWA

No. 15–0741

Filed October 27, 2017

**JASON CANNON,**

      Appellant,

vs.

**BODENSTEINER IMPLEMENT COMPANY,**

      Appellee,

and

**WINDRIDGE IMPLEMENTS, LLC, ECK & GLASS, INC.** d/b/a **EPG INSURANCE, INC.,** and **CNH AMERICA LLC** d/b/a **CASE IH,**

      Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Clayton County, John J. Bauercamper, Judge.

An implement dealer seeks further review of a court of appeals decision partially reversing a district court order granting it summary judgment. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Judith M. O'Donohoe of Elwood, O'Donohoe, Braun, White, L.L.P., Charles City, for appellant.

A. John Arenz, McKenzie R. Hill, and Brenton M. Tunis of O'Connor & Thomas, P.C., Dubuque, for appellee Bodensteiner Implement Company.

Andrew P. Nelson of Meyer, Lorentzen & Nelson, Decorah, for appellee Windridge Implements, LLC.

Michael A. McEnroe and Erin P. Lyons of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellee ECK & Glass, Inc.

Richard J. Kirschman of Whitefield & Eddy, P.L.C., Des Moines, for appellee CNH America, LLC.

**WIGGINS, Justice.**

An independent contractor providing liquid manure disposal services purchased a used Case IH tractor from a John Deere implement dealer. When the tractor proved to be a "lemon," the contractor brought claims against multiple parties, including the implement dealer. The trial court granted all of the defendants' motions for summary judgment. The contractor appealed and we transferred the case to the court of appeals.

The court of appeals affirmed the district court in all aspects except with regard to the district court's grant of summary judgment on the contractor's express warranty claim against the implement dealer. The implement dealer filed an application for further review, which we granted.

On further review, we exercise our discretion and only review the court of appeals ruling on the express warranty issues. On those issues, we find the disclaimers contained in the purchase agreement negate any express warranties allegedly made by the implement dealer. Therefore, we affirm the decision of the court of appeals in part, vacate it in part, and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Jason Cannon was an independent contractor affiliated for several years with D & J Pumping, which provides liquid manure disposal services to operators of livestock confinement facilities in northeast Iowa. Cannon's work required a heavy-duty tractor to haul tanks holding manure off premises to other premises where he would spread the waste on cropland as fertilizer. The work is very time sensitive as there are only brief periods in the spring and fall that are appropriate for the application.

In October 2010, Cannon was using a John Deere 8430 tractor he had purchased used from Bodensteiner Implement (Bodensteiner). Bodensteiner is a John Deere dealership that also deals in used farm equipment from other manufacturers. The John Deere tractor was not working properly, and Cannon found himself in need of a tractor. In the past, Cannon had always purchased John Deere tractors. However, he worked alongside brothers, Brian and Bruce Mitchell, who used Case IH tractors, and they spoke favorably of the brand.[1] Cannon knew the brothers for his whole life and valued their opinions about tractors.

Cannon had also previously consulted with others about Case IH tractors and had heard favorable comments about the brand, including their higher horsepower. Cannon decided to contact Roger Monroe, a salesperson at the Bodensteiner branch in Clermont, to inquire about available Case IH tractors.[2] Cannon had worked with Monroe before in prior purchases, including the purchase of the tractor he currently owned and was seeking to trade or sell. Cannon asked Monroe if the dealership had any used Case IH 285 tractors. Monroe was aware Cannon would be using the tractor for manure-hauling purposes. According to Cannon, Monroe "knew exactly what [he] needed."

Although the Clermont branch did not have any "red" tractors,[3] Monroe was able to find a used Case IH Magnum 305 tractor at

[1]Cannon stated in his September 24, 2013 deposition that he regarded the Mitchell brothers as knowledgeable about Case IH tractors and looked to them as a source of guidance. "They said [the Case IH 305 tractors] are . . . phenomenal tractor[s] and [people who own the Case IH 305] love them, they are . . . great tractor[s]."

[2]Cannon opted in part to go to a John Deere dealer for a used Case IH tractor because he believed he would get a better deal on his John Deere tractor at a John Deere dealer and a John Deere dealer would not want to have a "red" tractor (a Case IH tractor) in its inventory for long.

[3]Case IH are often referred to as "red" tractors, as opposed to John Deere "green" tractors. Farmers and other owners are often very loyal to their brand.

Bodensteiner's Monticello branch.[4]   A Case IH dealer sold this tractor when it was new to Gansen Pumping, which used it in a similar liquid manure disposal business.  Gansen Pumping traded the tractor to the Monticello branch.  At the time of its original sale, the tractor came with the manufacturer's warranty.  Gansen Pumping also purchased an extended warranty entitled "Purchase Protection Plan" (PPP), effective from November 18, 2008, to April 21, 2013.  The PPP covered certain powertrain repairs during this period and was transferrable.

Monroe informed Cannon about the red tractor at the Monticello branch.  According to Cannon, Monroe also told him the tractor "had a little more horsepower than what [Cannon] had, about the same hours, [and was a] really good tractor [that] should work great for [him]."  Cannon wanted to confirm the tractor had a big axle and a big draw bar on it.  Monroe agreed to check whether the tractor had these items and called the Monticello branch to find out.  Monroe told him the tractor had been used to haul manure already "so it was all setup and ready to go[;] it was all weighted up [and] had the big draw bar ready to go."  Cannon knew Monroe had never seen the tractor in question.  According to Cannon, Monroe told him the tractor had been "in the shop" and "everything [had been] tested out."

Monroe admits he told Cannon the tractor was in good condition.  In addition, Monroe spoke with Phil Kluesner, a salesperson at the Monticello branch who took the Case IH Magnum 305 tractor in on trade from Gansen Pumping.  Monroe relayed to Cannon that Kluesner said it was a good tractor, had been used satisfactorily for manure pumping,

---

[4]Bodensteiner has dealerships in several locations including Clermont and Monticello.

had passed inspection at the Monticello dealership, and had been driven around. Cannon also spoke to Neil, a mechanic at the Clermont branch, about the Case IH Magnum 305. Neil told Cannon that "[Cannon] would be happy with the horsepower and [with] what [he] was getting." Cannon understood Neil was speaking about the Case IH 305 generically and not about this tractor in particular.

Monroe informed Cannon if he was interested in the tractor he could go to Monticello, or Bodensteiner could truck the tractor up to Clermont. Bodensteiner was unwilling to transport the tractor from Monticello to Clermont unless Cannon actually purchased it and paid the $1000 trucking fee. In return, Bodensteiner agreed to trade tractors even up with Cannon, which on paper was a $138,000 trade. Monroe also told Cannon the PPP would be included with the purchase. He was not, however, familiar with the details of the PPP and suggested Cannon contact a Case IH dealer for more information. Cannon was in a hurry to get a new tractor, so he agreed to purchase the tractor without seeing it, inspecting it, or test driving it. Cannon allegedly told Monroe if it was a good running tractor and would work for manure pumping he wanted it.

The following day, October 6, 2010, Cannon signed the contract to purchase the tractor. The Case IH Magnum 305 arrived at the Clermont branch, and according to Monroe, he drove it approximately a block or block and a half and it drove fine. Cannon noted, however, that contrary to what Monroe had told him, the tractor did not have a big enough draw bar, so Cannon had to order one.

Cannon left his John Deere tractor, which he had just traded in, at Bodensteiner and proceeded to drive the Case IH tractor home. On the way home, he contacted Windridge Implement (Windridge), an authorized Case IH dealer, to inquire about the PPP. He also checked whether the

PPP effectively transferred to him. The ten-mile drive to his residence was uneventful. Upon arriving at his residence, Cannon proceeded to hook an empty tank to the tractor and start work for the day. After a couple of miles, he quickly realized the tractor did not have sufficient power, which he attributed to the turbocharger. A subsequent inspection revealed twelve turbo bolts were broken and rusted. Additionally, that same day, the nineteenth gear of the tractor went out, and shortly thereafter, the hydraulic pump exploded. Within a day or two of taking delivery, Cannon spoke to Monroe about these issues and asked for a loaner tractor while Windridge repaired the Case IH. Monroe advised him this was not possible.

Many of the initial issues with the tractor have been repaired and covered under the PPP. However, within a short period, the transmission overheated and the brakes failed.[5] This has become a recurring problem. Although numerous Case IH technicians and a field service agent attempted to address these issues, no one has been able to determine the underlying cause, and by 2012, Cannon concluded the tractor was a "lemon" and thus "unfixable."

On April 22, 2013, Cannon filed this suit. After amending his petition multiple times, Cannon ultimately alleged claims for fraudulent misrepresentation, breach of implied warranties, breach of an implied covenant of good faith and fair dealing, and equitable rescission against Bodensteiner. Cannon brought a breach of contract claim against Eck & Glass, Inc., the insurer who issued the PPP. Finally, Cannon brought

---

[5]Cannon subsequently learned the tractor, while owned by Gansen Pumping, had a significant repair history, including issues with the brakes and transmission overheating. Cannon asserted "[n]o one at Bodensteiner told him about the history of the tractor before he bought [it]."

claims against CNH America LLC for negligent design, manufacture, assembly, testing and warning; breach of implied warranty of merchantability; breach of express warranties; and fraudulent concealment or fraudulent nondisclosure. On motions for summary judgment, the district court dismissed all claims against all defendants.[6] With regard to defendant Bodensteiner specifically, the district court found "[t]he written contract between [the] parties disclaimed any express warranties other than the extended warranty or PPP, and there is no dispute that Cannon got the benefit of the PPP." Cannon appealed, challenging the district court's ruling in its entirety. We transferred the case to the court of appeals.

The court of appeals initially rejected Cannon's argument that the disclaimer on the purchase agreement was of no effect because Bodensteiner provided it after the parties reached an oral agreement. The court noted Cannon did not raise this issue in the district court, the district court did not address the issue, and Cannon failed to file a rule 1.904(2) motion. *See* Iowa R. Civ. P. 1.904(2). We agree with the court of appeals that Cannon failed to preserve this argument for our review. *See Stammeyer v. Div. of Narcotics Enf't*, 721 N.W.2d 541, 548 (Iowa 2006).

The court of appeals, however, found a genuine issue of material fact existed as to whether Monroe's assurances to Cannon that the "[tractor] is fit, it is ready, it is field ready" and "was in good condition" and "ready to go" created an express warranty upon which Cannon relied. The court concluded Bodensteiner's reliance upon the written

---

[6]Defendant AMT Warranty Corp. was previously dismissed from the case on summary judgment. Cannon also had a claim against Windridge for breach of contract, and Windridge had filed a counterclaim against Cannon for breach of contract based on nonpayment of repair bills. They subsequently settled.

disclaimers in the purchase agreement was "subject to resolution of whether Monroe's representations were mere puffing or opinion" and "under the facts of this case, resolution of that issue is for the fact finder." The court affirmed the district court on all other issues. Bodensteiner filed an application for further review, which we granted.

## II. Issues on Appeal.

When considering an application for further review, we have discretion to review all the issues raised on appeal or let the court of appeals decision stand as the final decision on an issue. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). In the exercise of our discretion, we will only review the court of appeals ruling on the express warranty issues. Therefore, the court of appeals decision on all other issues will stand as the final decision of this court in all other respects.

## III. Scope of Review.

We review a district court's ruling on a motion for summary judgment for correction of errors at law. *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 217 (Iowa 2016). "Our review is limited to determining whether the law was applied correctly or whether there is a genuine issue of material fact." *Id.* "The moving party has the burden of showing the nonexistence" of a genuine issue of material fact. *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015) (quoting *Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005)); *see also* Iowa R. Civ. P. 1.981(3) ("The judgment sought shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). "An issue of fact is 'material' only when the dispute involves facts which might affect the outcome of the suit, given the

applicable governing law." *Nelson*, 867 N.W.2d at 6 (quoting *Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd. of Dirs.*, 754 N.W.2d 854, 857 (Iowa 2008)). "An issue is 'genuine' if the evidence in the record 'is such that a reasonable jury could return a verdict for the non-moving party.' " *Id.* (quoting *Wallace*, 754 N.W.2d at 857).

**IV.  Discussion and Analysis.**

**A.  Was There an Oral Express Warranty?**  The district court did not expressly address this issue.  Rather, the district court decided even if Bodensteiner created any oral express warranty regarding the tractor through Monroe's conversations with Cannon, the written contract between the parties disclaimed any express warranty that Bodensteiner might have made to Cannon.  On the other hand, the court of appeals concluded there was a genuine issue of material fact as to whether Monroe's assurances to Cannon that the tractor was fit, field ready, and in good condition created an express warranty by Bodensteiner.  However, the court of appeals never reached the disclaimer issue.

For purposes of this appeal, we will assume without deciding, that Bodensteiner created at least one express warranty regarding the tractor through Monroe's conversations with Cannon.  We agree with the district court, however, this part of the case can be resolved by analyzing the disclaimer issue.  Therefore, we vacate that part of the court of appeals decision finding there was a genuine issue of material fact as to whether Monroe's assurances to Cannon created an express warranty.

**B.  Was There an Effective Disclaimer?**  The purchase agreement used in the transaction is essential to the analysis of the disclaimer issue.  This agreement is a preprinted John Deere products form signed by Cannon and Monroe on October 6, 2010, at the Clermont branch shortly before the tractor arrived from the Monticello branch.

The form lists the used 2008 Case IH 305 MFWD tractor as the "product" with a cash price of $139,000. It also includes under product the "Case Warranty." Under trade-in is listed the 2007 John Deere 8430 MFWD tractor with a trade-in value of $138,000 and a balance due of $1000. Directly below the description of the product and trade-in is the following language:

> **IMPORTANT WARRANTY NOTICE:** The John Deere warranty applicable to new John Deere product(s) is printed on the back side of this document. *There is no warranty on used products.* The new product warranty is part of this contract. . . . **YOUR RIGHTS AND REMEDIES PERTAINING TO THIS PURCHASE ARE LIMITED AS SET FORTH IN THE WARRANTY AND THIS CONTRACT. IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS ARE NOT MADE AND ARE EXCLUDED UNLESS SPECIFICALLY PROVIDED IN THE JOHN DEERE WARRANTY.**

(Emphasis added.) Below this, Cannon signed his name in the customer signature space, and Monroe signed as the salesperson accepting for Clermont Implement. The reverse side of the purchase agreement further states,

> **WHAT IS NOT WARRANTED – JOHN DEERE IS NOT RESPONSIBLE FOR THE FOLLOWING:** (1) *Used Products*;
>
> . . . .
>
> Where permitted by law, *neither John Deere [nor] any company affiliated with it makes any warranties, representations, or promises, express or implied* as to the quality or performance, or freedom from defects of its agricultural products other than those set forth above.
>
> . . . .
>
> **NO DEALER WARRANTY –** *THE SELLING DEALER MAKES NO WARRANTY OF ITS OWN* AND THE DEALER HAS NO AUTHORITY TO MAKE ANY REPRESENTATION OR PROMISE ON BEHALF OF JOHN DEERE, OR TO MODIFY THE TERMS OR LIMITATIONS OF THIS WARRANTY IN ANY WAY.

(Emphases added.)  The dealer made the delivery acknowledgment on October 11, 2010.

Section 554.2316 provides for the exclusion or modification of warranties.  In pertinent part, it provides,

> 1. Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (section 554.2202) negation or limitation is inoperative to the extent that such construction is unreasonable.

Iowa Code § 554.2316(1) (2011).  However, whenever words or conduct tend to limit or negate a seller's warranty, "the Code requires that the provision be construed as consistent with the warranty, if such a construction is reasonable." *Limited Flying Club, Inc. v. Wood*, 632 F.2d 51, 57 (8th Cir. 1980); *see* Iowa Code § 554.2316(1).  The parol-evidence rule, however, limits this requirement.  *See* Iowa Code § 554.2316(1).

The parol-evidence rule states,

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> 1. by course of performance, course of dealing, or usage of trade (section 554.1303); and
>
> 2. by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Iowa Code § 554.2202.

Furthermore, this court has stated,

> When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated. Determining whether an agreement is fully integrated is a question of fact, to be determined from the totality of the evidence. The presence of an integration clause is one factor we take into account in determining whether an agreement is fully integrated. Nevertheless, the parol-evidence rule does not prohibit the introduction of extrinsic evidence to show "the situation of the parties, . . . attendant circumstances, and the objects they were striving to attain." The parol-evidence rule also does not prohibit the admission of extrinsic evidence to prove fraud in the inducement.

*C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011) (citations omitted) (quoting *Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 433 (Iowa 1984)). Thus, in a fully integrated agreement, a party may not use extrinsic evidence, such as a prior oral agreement, "solely to vary, add to, or subtract from the agreement." *Id.*; *see Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996); *Kroblin*, 347 N.W.2d at 433; *see also Nationwide Agribusiness Ins. v. SMA Elevator Constr. Inc.*, 816 F. Supp. 2d 631, 690–91 (N.D. Iowa 2011).

Cannon fails to argue clearly that the purchase agreement is not a fully integrated document. Although there is no integration clause, there is no other evidence, other than the argument that there was an oral express warranty from the dealer regarding the condition of the tractor, to show that the written document is not fully integrated. This draws parallels to *Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18 (Iowa 2013). In that case, one party was "trying to replace [an] arbitration clause with its polar opposite—the lack of an arbitration clause." *Id.* at 25. We noted the party was not trying to "supplement" the written confirmations

but trying to reverse it. *See id.* We held "[t]he parol evidence rule exists to prevent this result." *Id.*

Here, if we were to allow the oral affirmations of warranty from the dealer to aid us in interpreting the purchase agreement, the oral affirmations would replace, or better yet reverse, the written disclaimers in the purchase agreement, rather than supplement them. In other words, Cannon is attempting to write out of the purchase agreement the written disclaimers that used products have no warranties and that the dealer can make no warranty of its own. *See Midwest Printing, Inc. v. Am Int'l, Inc.*, 108 F.3d 168, 171 (8th Cir. 1997) ("Under Missouri law, the disclaimer of warranties in a contract document is effective to bar a claim based on express warranty."); *Iowa Elec. Light & Power Co. v. Allis-Chalmers Mfg. Co.*, 360 F. Supp. 25, 34 (S.D. Iowa 1973) (holding "[t]he language in the warranty clause [was] simply too clear to be subject to" parol evidence).

Cases relied upon by Cannon are also distinguishable because they did not involve issues of a disclaimer. *See generally Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 824, 826 (N.D. Iowa 1997) (declining to discuss disclaimer in one price quotation because there were material issues of fact as to which of two price quotations constituted the terms of the contract and concluding oral assertions of performance capabilities of the equipment in question *may* constitute express warranties); *Keith v. Buchanan*, 220 Cal. Rptr. 392, 395–99 (Ct. App. 1985) (concluding affirmation of vessel's seaworthiness in sales brochures constituted, under the circumstances, an express warranty but no discussion of any disclaimer); *Weng v. Allison*, 678 N.E.2d 1254, 1256 (Ill. App. Ct. 1997) (finding the seller's statements to the buyers concerning the condition of the car were affirmations of fact that created an express warranty but no

discussion of any disclaimer); *Redmac, Inc. v. Computerland of Peoria*, 489 N.E.2d 380, 383 (Ill. App. Ct. 1986) (finding statements "free of defects" and would "work for a reasonable period of time" formed part of the basis of the parties' bargain but no discussion of any disclaimer); *Pake v. Byrd*, 286 S.E.2d 588, 590 (N.C. Ct. App. 1982) (holding under the circumstances defendant expressly warranted the tractor was in good condition and free from major mechanical defects with no discussion of any disclaimer at issue). Still other cases involved warranty disclaimers that were not obvious or clearly disclosed. *See Jacobson v. Benson Motors, Inc.*, 216 N.W.2d 396, 402 (Iowa 1974) (holding disclaimers not called to the plaintiff's attention and not sufficiently conspicuous were devoid of any force or effect); *Dailey v. Holiday Distrib. Corp.*, 260 Iowa 859, 864, 870, 151 N.W.2d 477, 481, 485 (1967) (holding where "[a]n unqualified purchase order appears on the face of a printed form [and] contains no reference to special conditions printed on the reverse side relating to warranties . . . ," the alleged disclaimer lacked legal effect).

Several other cases are distinguishable for other reasons. In *Limited Flying Club, Inc.*, the buyer of an aircraft signed a document stating he had inspected the aircraft and accepted it "as is" for the amount previously agreed upon. 632 F.2d at 53. Thereafter, an expert inspected the plane and found serious issues. *Id.* at 54. The buyer alleged the FAA-mandated logbook, including the certificates of airworthiness, applied. *See id.* at 56. The court concluded "[t]he 'as is' . . . clause was certainly not a 'complete and exclusive statement of the terms of the agreement' between [the parties]." *Id.* at 57 (quoting Iowa Code § 554.2202). It found "[t]he description of the airplane as set forth in the logbook [constituted] a consistent additional term and may be introduced to explain the actual agreement between the parties." *Id.*

There is nothing remotely akin to an airplane's FAA-mandated logbook here.

Cannon also claims Bodensteiner misinterprets *Williams v. Mid-Iowa Equip., Inc.*, 223 F. Supp. 3d 866 (S.D. Iowa 2015)*.* In that case, the federal magistrate granted summary judgment to the auctioneer of a tractor who allegedly told the buyer that the tractor was "100% field ready." 223 F. Supp. 3d at 870, 873. The listing information stated all equipment was sold "as is" with no guarantees. *Id.* at 870. In addition, the invoice stated the seller made no warranties of any kind and all sales were "AS IS." *Id.* The buyer did not inspect the tractor before the purchase. *Id.* After receiving the tractor, the buyer alleged it had a substantial oil leak, more service hours than the logged hours, which were noted to be unverified, and less horsepower than advertised. *Id.*

In his claims against the seller, the buyer did not raise, however, any warranty claims. *Id.* at 871. Rather, he raised breach of contract. *Id.* He claimed the contract was not fully integrated, such that parol evidence allowed the alleged "100% field ready" representation to be part of the contract. *Id.* Since "as is" is readily understood to mean the buyer is taking the item in its present condition, the court concluded there would have to have been a meeting of the minds for "100% field ready" to become a term of the contact. *Id.* at 872. Assuming the document was not fully integrated, the court found no evidence that "100% field ready" was made a term of the contract. *Id.* It was not contained in the invoice and Williams paid the invoice thus agreeing to the terms thereon. *Id.*

Here, Cannon agreed "[t]he court correctly held that if the statement '100% field ready' was to be made part of the contract[,] it should have been referred to in the written contract in light of the 'as is' language." His only response to the situation at hand is that the

disclaimer of warranty information is in very small print and arguably speaks only to John Deere products. This is an argument Cannon should have pursued in the district court, but he failed to do so. *See Segura v. State*, 889 N.W.2d 215, 219 (Iowa 2017) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002))).

Therefore, assuming the statements made by Monroe constituted an oral express warranty, we hold the purchase agreement signed by both parties effectively disclaim such a warranty.

**V. Disposition.**

Finding the disclaimers contained in the purchase agreement negate any express warranties allegedly made by Monroe through conversations with Cannon, we affirm the decision of the court of appeals in part, vacate it in part, and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**